J-S24032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAPHAEL E. PEREZ-RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 1381 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 22, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0002261-2020

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: JULY 31, 2023**

Appellant, Raphael E. Perez-Rodriguez, appeals from the judgment of sentence entered in the Court of Common Pleas of Berks County following his conviction by a jury on the charges of first-degree murder, burglary, robbery, aggravated assault, two counts of receiving stolen property, and two counts of firearms not to be carried without a license.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: The charges in the instant matter stem from a traffic stop of Appellant, which then led to an investigation and the arrest of Appellant for the murder of Dennis Fink ("the

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 3502(a)(1)(i), 3701(a)(1)(i), 2702(a)(1), 3925, and 6106, respectively.

Victim"), who had been stabbed to death, as well as the burglary of the Victim's residence.

On December 11, 2020, Appellant filed a counseled omnibus pre-trial suppression motion wherein he sought the suppression of all evidence seized from the Victim's house, which is located on Tully Lane in Reading, Pennsylvania. Appellant averred the police improperly entered and conducted an unconstitutional warrantless search of the Victim's house. The Commonwealth, in response, averred Appellant lacked a reasonable expectation of privacy in the Victim's home. Further, the Commonwealth asserted the police properly entered and conducted a warrantless search of the Victim's residence due to exigent circumstances.

On January 25, 2021, Appellant proceeded to a suppression hearing at the commencement of which the Commonwealth moved for the transcript from Appellant's preliminary hearing to be marked as an exhibit, and Appellant indicated he had no objection. N.T., 1/25/21, suppression hearing, at 4. The Commonwealth then offered the testimony of Vincent Caruso, who is the system administrator for the inmate telephone system at the Berks County jail, and Berks County Detective Ivan. R. Martinez. The suppression court, indicating it adopted the testimony and evidence from the preliminary hearing, as well as the suppression hearing, aptly summarized the relevant evidence as follows:

> At approximately 7:40 p.m., in the evening on July 16, 2020, Officer Eric Koller of the City of Reading Police Department

was on patrol in the 500 block of Washington Street in the City of Reading when he observed a black Honda CRV ("the Vehicle") with a Minnesota license plate that appeared to be altered. N.T., 8/26/20, preliminary hearing, at 4-5. Having noticed the allegedly altered license plate, Officer Koller checked the registration information electronically, which returned a result that the Vehicle was reported stolen. *Id.* at 5. Officer Koller continued to follow the Vehicle, but before he could initiate a traffic stop, the Vehicle parked in the 100 block of North 3rd Street, whereupon the driver, later identified as [Appellant], exited the Vehicle. *Id.* at 5-6. Backup [officers] arrived shortly thereafter, and [Appellant] was detained in handcuffs until the patrol wagon arrived, and [Appellant] was placed therein. *Id.* at 7.

Loud music continued to play from a wireless speaker inside the Vehicle, and Officer Koller reapproached the Vehicle to turn off the music. *Id.* As Officer Koller reached into the Vehicle to turn the speaker off, he noticed a small, blue, Ziplock bag containing a white, powdery substance located in the handhold of the driver's side door. *Id.* Officer Koller recovered the bag and continued to search the rest of the Vehicle. *Id.* Under the driver's seat, Officer Koller found two loaded handguns—a semi-automatic and a revolver. *Id.* at 8. Two knives were found between the driver's seat and the door jamb. *Id.* In the cargo area, police found a rifle and semi-automatic shotgun, as well as a bubble envelope addressed to the Victim containing $CO_2$ cartridges for a BB gun and several bank cards in the Victim's name. *Id.*

Officer Koller later performed a NARK-2 field test on the suspected drugs from the vehicle, which indicated a positive result for cocaine. *Id.* at 9. A [records] check also indicated that [Appellant] did not have a valid license to carry the firearms. *Id.* When [Appellant] was arrested, he was found in possession of several personal items belonging to the Victim, including a high school ring, an Air Force Academy graduation ring, several wedding bands, and a tie bar. *Id.* at 15.

Officer Koller informed Eric Sweitzer, a criminal investigator with the Reading Police Department ("C.I. Sweitzer"), about the stolen Vehicle investigation and notified C.I. Sweitzer about items found in the stolen Vehicle belonging to the Victim. *Id.* at 16. C.I. Sweitzer researched the Victim's name and found an individual who was listed as living at the property located at ** Tully Lane in Reading, Pennsylvania ("the Property"). *Id.* C.I. Sweitzer visited the Property, observed that some exterior and interior lights were on, and then attempted to make contact with

the owner. *Id.* at 17. However, C.I. Sweitzer was unsuccessful and left his business card in the door. *Id.* at 18. C.I. Sweitzer returned to the Property the next day and noticed that the Property looked to be in exactly the same condition as the night before, including his business card still stuck in the door. *Id.* C.I. Sweitzer, along with Criminal Investigator Scott Errington, then walked to the rear of the residence to attempt contact, but they were unsuccessful. *Id.* at 19. C.I. Sweitzer then contacted the local police department and requested an officer onsite so that a welfare check could be performed. *Id.* at 20.

After the local officer arrived, C.I. Sweitzer entered the Property through an unlocked door of the kitchen/dining room. *Id.* Once inside, C.I. Sweitzer announced himself, but he found no one was inside; however, he found a small, black dog in a cage, alive and barking. *Id.* at 21. C.I. Sweitzer observed that the cabinet doors in the kitchen were open, and the house seemed unkempt. *Id.* at 21-22. Making their way through the home looking for the Victim or anyone else, the investigators noticed that closets were left open with lights on, and the house looked like it had been ransacked. *Id.* at 22. Likewise, the garage and basement lights were left on, and a blue Tesla vehicle was still in the garage. *Id.* Sensing that something was not right, C.I. Sweitzer was leaving the Property to contact possible family members when he noticed a duffle bag, in which he could see, without manipulation, a baseball cap and a glass jar containing suspected marijuana. *Id.* at 22-23.

C.I. Sweitzer was unable to garner further information on the Victim's whereabouts from family members, so he applied for a search warrant for the Property to retrieve the suspected marijuana, which was then approved. *Id.* During the search, [the Victim's] decomposing body was found in the wooded area abutting the Property. *Id.* at 24-25.

* * *

On July 16, 2020, [before the traffic stop involving Appellant], Jeffrey Neubauer, an individual living in the same neighborhood as the Victim, noticed a young girl with a lost dog outside of his home. *Id.* at 37-38. Mr. Neubauer took the dog, called the phone numbers on the dog's tags, and found out the address listed for the dog was ** Tully Lane. *Id.* at 38. Mr. Neubauer and his girlfriend then traveled to the Property to return the dog. *Id.* When Mr. Neubauer and his girlfriend approached the Property, they noticed it appeared unkempt. *Id.* at 39. Upon

ringing the doorbell twice and knocking on the door, a man, whom Mr. Neubauer identified as [Appellant], answered the door wearing cargo shorts, a muscle t-shirt, and a red-brimmed cap[.] *Id.* at 39-40. [Appellant] only opened the door halfway. *Id.* Mr. Neubauer did not remember whether [Appellant] answered in the affirmative when asked whether the lost dog was his, but he recalled [Appellant] grabbed the dog. *Id.* at 40. When Mr. Neubauer's girlfriend asked [Appellant] if he was "Dennis," [Appellant] responded with "Yes." *Id.* at 61. Mr. Neubauer noted that the interaction seemed odd because [Appellant] did not appear to be happy to have his dog returned. *Id.* at 42. Mr. Neubauer checked on Facebook and found that the Victim, Dennis Fink, was actually an older white male. *Id.* The next day, Mr. Neubauer was presented with a photo lineup whereupon he identified [Appellant] as the individual he saw at the Property the day prior. *Id.*

On July 17, 2020, Detective Ivan Martinez ("Detective Martinez"), who was with the Berks County District Attorney's Office, was called to the Property for a body that had been found. *Id.* at 46-47. Detective Martinez arrived at the Property and proceeded to the wooded area adjacent to the rear where there was a body lying face down and covered in brush. *Id.* at 47. The body was later identified as the Victim, who was the owner the Property. *Id.* at 48. The next day, after preparing a search warrant that was approved, Detective Martinez participated in the search of the Property, during which he observed that the home appeared to have been ransacked. *Id.* at 48-49. A bag, that did not appear to be the Victim's, was found containing a gun, money, and coins. *Id.* at 49. Also seized was the baseball cap and suspected marijuana. *Id.* at 51-52.

On July 20, 2020, Detective Martinez, along with Detective Sergeant Brett Forry, met with [Appellant] at the Berks County Jail System for an interview. *Id.* at 52-53. During the interview, [Appellant] told Detective Martinez that he came from New Jersey to Reading because of his business, [which involved] buying and reselling guns, coins, and other odds and ends. *Id.* at 53. Initially, when Detective Martinez showed a photograph of the Property to [Appellant], [Appellant] acted as if he did not recognize the house. *Id.* at 54. When Detective Martinez mentioned that someone could place [Appellant] at the Property, [Appellant] admitted that he had been to the Property, but he specified that he stopped at a yard sale and was led inside the home by a black male, named "Bu," and that the house looked

ransacked when he entered. *Id.* at 54-55, 58. [Appellant] described the Property with detail, including the presence and situation of objects in the garage area. *Id.* at 55. [Appellant] indicated that he had been driving around the neighborhood looking for yard sales because he knew that rich people lived in the area. *Id.* at 54. [Appellant] further told the detectives that the items found in the Vehicle did come from the Property, but he insisted that he had purchased the items from "Bu" for $1,500.00. *Id.* at 56. [Appellant] also admitted that he had told Mr. Neubauer's girlfriend that he was the Victim when the dog was returned. *Id.* at 57. However, [Appellant] denied ever seeing the Victim. *Id.*

Detective Martinez testified at the preliminary hearing that he had reviewed a phone call that [Appellant] placed from the Berks County Jail on July 31, 2020, in which [Appellant] relayed a different story regarding his involvement in the Victim's death. *Id.* at 60-62. In the phone call, [Appellant] told his mother and sister that the Victim, who [Appellant] claimed was a marijuana customer of [Appellant's], owed [Appellant] money, and owed a Mexican cartel money in relation to human trafficking of prostitutes. *Id.* at 62. [Appellant] continued that the Mexican cartel ordered him to kill the Victim or [Appellant] himself would be killed. *Id.*

\*\*\*

Vincent Caruso, the system administrator of the inmate telephone system at the Berks County Jail System,…explained that prior to an inmate making a phone call from the prison, a message is played informing both parties that the phone call is being recorded. N.T., 1/25/21, suppression hearing, at 8-9. Mr. Caroso likewise stated that upon booking, prisoners are provided with an Inmate Telephone ID Release Form ("T.I.D. Form"), containing the prisoner's personal identification number for phone calls, as well as a provision indicating that phone calls are monitored and recorded, which the prisoner then signs. *Id.* The Commonwealth introduced [Appellant's] signed T.I.D. Form, which was printed in both English and Spanish, that [Appellant] had signed. *Id.* at 9-11.

Suppression Court Opinion, filed 3/29/21, at 2-6.

By order entered on March 29, 2021, the suppression court denied Appellant's omnibus pre-trial suppression motion. Thereafter, on April 18, 2022, Appellant, who was represented by counsel, proceeded to a jury trial.

The trial court has summarized at length the testimony and evidence offered at the jury trial. **See** Trial Court Opinion, filed 2/27/23, at 2-25. The trial court has provided citations to the record for each finding, and we conclude the findings are supported by the record. Accordingly, we adopt and rely on the trial court's summary.

At the conclusion of the trial, the jury convicted Appellant of the offenses indicated *supra*, and on April 22, 2022, the trial court imposed an aggregate sentence of life in prison. On May 2, 2022, Appellant filed a timely counseled post-sentence motion seeking a judgment of acquittal on the basis the evidence was insufficient to sustain his convictions, as well as a new trial on the basis the jury's verdict was against the weight of the evidence.

By order entered on August 26, 2022, the trial court denied Appellant's post-sentence motion, and this timely counseled appeal followed on September 23, 2022. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a responsive opinion on February 27, 2023.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Presented" (verbatim):

A. Whether the evidence adduced at Suppression was insufficient to establish that [Appellant] lacked an expectation of privacy

at the residence searched, whether an exigency existed sufficient to justify the warrantless search subsequently conducted, and whether the subsequently obtained Search Warrant was obtained with probable cause based, in part, from things observed during said warrantless search that was illegally obtained?

B. Whether the evidence adduced at trial was insufficient to establish beyond a reasonable doubt that Appellant committed a premeditated, willful and deliberate killing, or an aggravated assault, or a robbery where there was no evidence that [Appellant] had at any time come into contact with the victim, other than conjecture that [Appellant's] mere presence at the victim's home [*sic*] he must have killed the victim?

C. Whether the Court erred by not granting a new trial on the basis that the verdict of guilt for murder of the first degree was contrary to the weight of the evidence, where there was literally no physical or circumstantial evidence produced at trial?

Appellant's Brief at 10 (suggested answers omitted).

Initially, we address Appellant's sufficiency of the evidence claim.[2] Appellant contends the evidence was insufficient to sustain his convictions for first-degree murder, aggravated assault, and robbery. Specifically, Appellant does not dispute that someone committed these crimes against the Victim; however, he contends there is no evidence that he was the perpetrator of the crimes.

_____

[2] For the ease of discussion, we address Appellant's sufficiency of the evidence and weight of the evidence claims before addressing his suppression claim since, if Appellant should succeed on one of these claims, we need not address his suppression claim. ***Commonwealth v. Shamberger***, 788 A.2d 408, 412 (Pa.Super. 2001).

Initially, we note this Court's standard of review when considering a challenge to the sufficiency of the evidence requires us to look at the evidence in a light most favorable to the Commonwealth, as verdict winner, and determine whether the evidence presented, actual and/or circumstantial, was sufficient to enable a fact-finder to find every element of the crime charged, beyond a reasonable doubt. **See Commonwealth v. O'Brien**, 939 A.2d 912 (Pa.Super. 2007).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and the circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

**Id.** at 913–914 (quotation omitted). The jury, as the finder of fact, is free to believe all, some, or none of the evidence presented and is free to determine the credibility of the witnesses. **Commonwealth v. Dailey**, 828 A.2d 356 (Pa.Super. 2003). In conducting review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder. **Commonwealth v. Baumgartner**, 206 A.3d 11, 14-15 (Pa.Super. 2019).

As indicated *supra*, Appellant's argument is specific in nature. Rather than challenge the sufficiency of the evidence to support any of the applicable elements of the offenses, Appellant contends the evidence was insufficient to prove that he was the person who robbed the Victim and stabbed the Victim

to death before dumping his body in the woods behind his home.[3]  As such,

we need not conduct a thorough review of the evidence to determine whether

it can support a finding that all of the elements of the offenses have been

met.[4]   Rather, we will focus on the specific sufficiency issue raised by

Appellant: whether the evidence was sufficient to establish that Appellant was

_____

[3] Appellant presents no argument challenging his convictions for burglary or two counts of firearms not to be carried without a license.  Appellant suggests his conviction for receiving stolen property is insufficient on the basis the Commonwealth allegedly failed to adduce evidence as to valuation.  **See** Appellant's Brief at 44.   However, Appellant's one-paragraph argument presents bald assertions without any citation to relevant authority.  **See id.** at 44-45.  Since Appellant has not properly developed this claim, we conclude it has been waived. **See** Pa.R.A.P. 2119.  Alternatively, the trial court has aptly addressed and rejected Appellant's sufficiency challenge to his conviction for receiving stolen property, and we find no error.  **See** Trial Court Opinion, filed 2/27/23, at 32-33.

[4] The relevant criminal statutes provide:
> **§ 2502. Murder**
> **(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2505(a) (bold in original).
> **§ 3701. Robbery**
> **(a) Offense defined.**--
> (1) A person is guilty of robbery if, in the course of committing a theft, he:
> (i) inflicts serious bodily injury upon another[.]

18 Pa.C.S.A. § 3701(a)(1)(i) (bold in original).
> **§ 2702. Aggravated assault**
> **(a) Offense defined.--**A person is guilty of aggravated assault if he:
> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1) (bold in original).

the perpetrator of the robbery, aggravated assault, and first-degree murder

of the Victim.

This Court has recognized that:

[E]vidence of identification need not be positive and certain to sustain a conviction. ***Commonwealth v. Jones***, 954 A.2d 1194, 1197 (Pa.Super. 2008)[.] Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. ***Commonwealth v. Minnis***, 458 A.2d 231, 233–34 (Pa.Super. 1983). Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. ***Id.*** at 234. Given additional evidentiary circumstances, "any indefiniteness and uncertainty in the identification testimony goes to its weight." ***Id.*** at 233.

***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa.Super. 2011) (*en banc*)

(quotation marks omitted).

Here, in addressing and rejecting Appellant's sufficiency of the evidence

claim, the trial court relevantly indicated the following:

Appellant claims that the Commonwealth failed to present sufficient evidence that Appellant was ever at the [Tully Lane] residence at the same time as the Victim to present such an opportunity to commit the crimes, or that he was ever in a position to threaten or touch the Victim personally. Appellant further claims that no evidence or testimony eliminated the possibility of another perpetrator having committed the crimes and that law enforcement only investigated Appellant to the exclusion of other possible suspects.

\*\*\*

When initially stopped [in the Honda], Appellant was found in possession of multiple items belonging to the Victim, including the Victim's Tesla car fob, graduation rings, laptop, wallet, identification cards, and various credit and debit cards. After finding these items, law enforcement proceeded to the residence,

- 11 -

and when unable to make initial contact, made various attempts to reach the Victim. Upon entering the residence, officers found the rooms, drawers, and closets disheveled as if they had been ransacked. Alarm panels were found ripped off of the wall and on the floor. When they returned with a search warrant for the residence, they discovered the Victim deceased in the [woods at the] rear of the residence.

Dr. Hoffman concluded that the Victim died from exsanguination and internal bleeding caused by multiple stab wounds to the Victim's neck and chest. Dr. Hoffman testified that the nature and varying direction of the injuries indicated that the bodies were in close contact and in motion, signaling a struggle occurred during the infliction of the wounds. Further, while Dr. Hoffman suggested that the maggot activity he observed w[as] indicative that the Victim's time of death was approximately thirty to forty-hours prior to discovery, he noted that information provided by law enforcement allowed him to narrow that period to between 8:45 a.m. and 12:00 p.m. on July 16, 2020.

During his interview with detectives, [Appellant initially denied recognizing the residence; however,] Appellant [then] admitted that he had been to and was able to describe the residence in detail. In a phone call with his sister and mother, Appellant admitted being involved in the murder of the Victim but claimed that the Victim purchased drugs from him[,] the Victim was involved in human trafficking[,] and the Victim's murder was directed by a Mexican cartel.

Cell phone records tracked Appellant's movements from Paterson, New Jersey and arriving in the area of the residence around the time of the Victim's murder and remaining until the afternoon. Several people observed an individual matching Appellant's description and clothing at or around the residence, including several people who returned the Victim's wandering dog and found the individual's response as odd or apathetic. Jeffrey Neubauer identified Appellant as the individual he saw at the residence when [he] was presented with a photographic array, and he told law enforcement officers that he noticed the individual at the residence was wearing the same branded underwear as was later recovered from Appellant.

While no evidence was found regarding the actual murder weapon, there was genetic evidence linked to the Victim found on Appellant's shoes, which were found at the residence. Additionally, the Victim's DNA was found on Appellant's shirt.

Viewing the evidence presented at trial in totality, the Commonwealth presented sufficient evidence to place Appellant at the residence at the time of the Victim's murder, including cell phone records and eyewitnesses who either identified Appellant or described an individual matching Appellant's description as being present at the residence on the date of the Victim's death and even posing as the Victim himself. Blood and DNA evidence was found on Appellant's shoes and clothing. Appellant confessed to being at the residence to law enforcement and admitted to his sister and mother of, at least, being involved in the Victim's murder. Again, Dr. Hoffman's testimony concluded that the Victim died as a result of the stab wounds and noted that the direction and severity of the wounds indicated a struggle. Moreover, the location of the stab wounds to the neck and chest evinces both malice and an intent to kill. Given the reasonable inferences that could be drawn from the evidence presented, [the trial court] find[s] that Appellant's challenge[s] to the sufficiency of the evidence to support his conviction[s] for first-degree murder[, aggravated assault, and robbery] lack merit.

Trial Court Opinion, filed 2/27/23, at 28-30.

We agree with the trial court's sound reasoning. As indicated *supra*, "[e]vidence of identification need not be positive and certain to sustain a conviction." **Commonwealth v. Ovalles**, 144 A.3d 957, 969 (Pa.Super. 2016) (citation omitted). As our Supreme Court has held, "circumstantial evidence is sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." **Commonwealth v. Chambers**, 528 Pa. 558, 599 A.2d 630, 635 (1991) (quotation and quotation marks omitted).

In the case *sub judice*, the jury, as the finder of fact, heard the testimony of all witnesses, was free to make credibility determinations, and determined the evidence linked Appellant to the crimes beyond a reasonable

- 13 -

doubt. Given our standard of review, we find no error in this regard and conclude there is no merit to Appellant's sufficiency of the evidence claim. **See Baumgartner**, **supra** (setting forth this Court's standard of review for sufficiency of the evidence claims).

We next address Appellant's claim that the jury's verdicts for first-degree murder, aggravated assault, and robbery were against the weight of the evidence. Specifically, Appellant contends there is no credible evidence that Appellant was the perpetrator of the crimes. He avers the jury's conclusion he was the perpetrator is based on mere speculation and conjecture. Thus, he avers the jury's verdict shocks one's sense of justice such that the trial court erred in failing to order a new trial.[5]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Talbert**,

---

[5] Appellant adequately preserved his weight of the evidence claim as to his first-degree murder, aggravated assault, and robbery convictions in the lower court and in his Rule 1925(b) statement. **See** Pa.R.Crim.P. 607; Pa.R.A.P. 1925(b). Appellant presents in his appellate brief an undeveloped weight of the evidence claim, without citation to authority, regarding the jury's verdict for receiving stolen property. **See** Appellant's Brief at 47. He suggests the evidence regarding the value of the stolen items was incredible. **See id.** We dispose of this claim simply by noting the jury was free to accept the Commonwealth's evidence regarding the value of the stolen property. **Commonwealth v. Hopkins**, 747 A.2d 910, 917 (Pa.Super. 2000). Appellant has presented no weight of the evidence challenge to his convictions for burglary and firearms not to be carried without a license.

- 14 -

129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly stated the following:

> At trial, the jury heard all of the testimony and was presented [with] the evidence. The Commonwealth presented evidence that Appellant was stopped in a stolen vehicle with a substantial amount of the Victim's valuables and belongings on his

- 15 -

person and in the vehicle. The jury heard evidence tracking Appellant's location from Paterson, New Jersey, where the vehicle had been stolen, and to the area of the [Tully Lane] residence. When law enforcement arrived at and later searched the residence, they found the home ransacked and the alarm panels ripped from the walls. The Victim's Tesla vehicle, to which Appellant had the fob on his person, was still in the garage. Dr. Hoffman testified the Victim's time of death was between 8:45 a.m. and noon on July 16, 2020, which was around the same time that Appellant arrived and remained in the area of the residence. Several eyewitnesses place Appellant, or at least an individual resembling Appellant, at the residence on July 16, 2020, and even identifying himself as the Victim. Dr. Hoffman further testified as to the extent of the Victim's injuries and the conclusions drawn from both bruising and abrasions observed on the Victim, and from the direction and severity of the stab wounds. The Commonwealth also presented blood and DNA evidence from the Victim found on Appellant's sneaker and shirt. Despite Appellant's contention otherwise, the phone call to his mother and sister, at a minimum, implicated Appellant in the Victim's murder, regardless of his various justifications or suggestion of other unnamed individuals. Based on all of the evidence presented, it is clear that the trial court did not abuse its discretion in denying Appellant's post-sentence challenge to the weight of the evidence.

The jury's verdict indicates that they lent credibility to the Commonwealth's witnesses and did not choose to accept the Defense witness' dispute of the blood and DNA evidence. The verdicts rendered by the jury were not against the weight of the evidence. Further, Appellant's attack on the deliberation period of the jury as somehow demonstrative of a lack of diligence on the party of the jury is absurd. The jury spent four days observing the testimony and evidence and was properly charged by the court in its analysis of the evidence. [The trial court] draw[s] no inference from the fact that the jury was able to come to a decision in what Appellant deemed a relatively short amount of time. Therefore, [the trial court] find[s] Appellant's claim that the court abused its discretion as to the weight of the evidence to be without merit.

Trial Court Opinion, filed 2/27/23, at 37.

- 16 -

We agree with the trial court's sound reasoning, and we find no abuse of discretion in this regard. **Talbert**, **supra**. Simply put, the jury considered the evidence linking Appellant to the burglary and stabbing death of the Victim. The jury found the Commonwealth's witnesses credible while rejecting Appellant's witnesses and defense theories. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. **See Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Thus, we find no merit to Appellant's weight of the evidence claim.

We next address Appellant's suppression issue. Appellant contends the Commonwealth bore the burden of demonstrating Appellant did not have a legitimate expectation of privacy in the Victim's residence and, since "[t]he Commonwealth at [the] suppression [hearing] offered no additional evidence or testimony regarding the defendant's expectation of privacy, other than admitting the transcript of the testimony taken at the preliminary hearing[, the Commonwealth did not meet its burden]." Appellant's Brief at 16.

In reviewing Appellant's suppression claim, we are mindful that:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on

questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 639 Pa. 100, 159 A.3d 503, 516 (2017) (citations omitted).

Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution "guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa.Super. 2008) (citation omitted). In Pennsylvania, a defendant charged with a possessory offense has "automatic standing" to pursue a suppression motion under Rule 581.[6] *Commonwealth v. Burton*, 973 A.2d 428, 435 (Pa.Super. 2009) (*en banc*). Nevertheless, "in order to prevail, the defendant…must show that he had a privacy interest in the area searched." *Id.* at 434.

Our Supreme court has clarified that challenges to a defendant's expectation of privacy involve shifting burdens of proof. *Commonwealth v. Enimpah*, 630 Pa. 357, 106 A.3d 695, 700-01 (2014). The Commonwealth has the initial burden to "present evidence that the defendant's constitutional rights were not infringed." *Id.* at 701. If the Commonwealth presents evidence which shows the defendant "lacked a privacy interest, the burden

---

[6] Here, Appellant was charged with possessory offenses.

shifts to the defendant to demonstrate he had a reasonable expectation of privacy in the area searched." *Id.* Thereafter, it is incumbent on the suppression court to consider all of the evidence to determine whether the Commonwealth met its burden of production, and, if so, whether the defendant met his burden of persuasion that he possessed a reasonable expectation of privacy in the area searched by the police.[7] *See id.*

"The expectation of privacy is an inquiry into the validity of the search or seizure itself; if the defendant has no protected privacy interest, neither the Fourth Amendment nor Article I, § 8 is implicated." *Id.* at 699.

> An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.

---

[7] If the Commonwealth's evidence conclusively establishes that the defendant had no expectation of privacy in the area searched, then the Commonwealth has met its burden of proving that the evidence was properly obtained, and the suppression motion challenging the search must be denied. *See Enimpah*, *supra*, 106 A.3d at 702 (noting that the Commonwealth's burden is "to give the [suppression] court evidence allowing" the court to conclude a defendant lacked a reasonable expectation of privacy); Pa.R.Crim.P. 581(H) (providing that "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights").

*Commonwealth v. Viall*, 890 A.2d 419, 422 (Pa.Super. 2005) (citations and quotation marks omitted).

"[T]he Fourth Amendment does not shield only those who have title to the searched premises." *Bostick*, 958 A.2d at 552 (quotation and quotation marks omitted). Rather, "a defendant must establish a possessory interest, a legitimate presence, or some factor from which a reasonable and justifiable expectation of privacy could be deduced to prove that this subjective expectation of privacy is legitimate." *Id.* (quotation and quotation marks omitted). Thus, even if not an owner or lessee of the premises, "a defendant who is more than a casual visitor to the...dwelling [searched by police] has the right under the Fourth Amendment to the United States Constitution...to challenge the search [of the dwelling] and seizure of [evidence therefrom]." *Commonwealth v. Rodriguez*, 679 A.2d 1320, 1325 (Pa.Super. 1996) (citation omitted).

Relevantly,

In *Commonwealth v. Govens*, 632 A.2d 1316 (Pa.Super. 1993) (*en banc*), this Court reiterated that…an occupant other than the owner or lessee of a [residence] [must] demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy. *Govens*, 632 A.2d at 1319[.] We further stated that,

[f]actors to be considered in determining whether a defendant has a legitimate expectation of privacy in another person's home include: (1) possession of a key to the premises; (2) having unlimited access to the premises; (3) storing of clothing or other possessions on the premises; (4) involvement in

> illegal activities conducted on the premises; (5) ability to exclude other persons from the premises; and (6) expression of a subjective expectation of privacy in the premises.

***Bostick***, 958 A.2d at 553 (citation and quotation marks omitted).

Initially, Appellant contends the Commonwealth conceded and/or did not challenge whether he had an expectation of privacy in the Victim's home such that his burden to rebut was never triggered. While Appellant is correct that the Commonwealth may concede the defendant has an expectation of privacy, or otherwise not challenge the expectation of privacy such that it waives any objection/challenge thereto for appellate review, such did not occur in the case *sub judice*. ***Commonwealth v. Skipper***, 277 A.3d 617, 620 (Pa.Super. 2022). Rather, here, in both its response to Appellant's pre-trial suppression motion, as well as during the suppression hearing, the Commonwealth specifically argued Appellant did not have an expectation of privacy in the Victim's home on Tully Lane. ***See*** Commonwealth Response, filed 1/14/21, at 8-9; N.T., 1/25/21, suppression hearing, at 7.

Appellant next suggests the Commonwealth did not present any evidence demonstrating he lacked an expectation of privacy in the home on Tully Lane, and thus, the burden never shifted to Appellant to persuade the suppression court he had a reasonable expectation of privacy in the searched premises.

In rejecting Appellant's claim, the suppression court indicated the following:

[Appellant] argues that the Commonwealth has failed to fulfill its burden of production in demonstrating that he lacked an expectation of privacy in the [premises searched on Tully Lane]. [Appellant] notes that the Commonwealth failed to present any further testimony or evidence, other than that which was presented at the preliminary hearing,[8] in support of its burden....[Appellant] concludes that his failure to establish a reasonable expectation of privacy is inconsequential because the Commonwealth was unsuccessful in its initial burden of production. We disagree.

When [Appellant] was stopped in a stolen vehicle with bank cards and an envelope displaying the Victim's name, C.I. Sweitzer researched the Victim's name and found that he lived at the Property [on Tully Lane]. After a first unsuccessful attempt to contact the Victim, C.I. Sweitzer returned the next day and, after the arrival of local law enforcement, entered the Property in order to perform a welfare check on the Victim. [Appellant] was not present at the Property when law enforcement entered the premises. Once inside, C.I. Sweitzer [noticed] the Property [was] disheveled and appeared as if he had been ransacked. Likewise, law enforcement observed that a blue Tesla was still parked in the

---

[8] To the extent Appellant contends the Commonwealth was not permitted to introduce the notes of testimony from the preliminary hearing in establishing that Appellant lacked a privacy interest in the Victim's home, we note Appellant has waived this claim. During the suppression hearing, the following relevant exchange occurred:

**[ADA]:** Your Honor, as a preliminary matter, I have marked the transcript from the Preliminary Hearing as Commonwealth's Exhibit number 1, and I would move for its admission.

**THE COURT:** [Defense Counsel,] do you have a position with regard to that exhibit?

**[DEFENSE COUNSEL]:** No objection, Your Honor.

**THE COURT:** [Defense Counsel,] is that the same document that is attached to your motion?

**[DEFENSE COUNSEL]:** It is, Your Honor.

**THE COURT:** All right. Commonwealth's [Exhibit] 1 is admitted.

N.T., 1/25/21, suppression hearing, at 4-5 (bold added). Based on this exchange, Appellant has waived the issue of whether the preliminary hearing transcript was properly admitted during the suppression hearing for purposes of establishing Appellant lacked a legitimate expectation of privacy in the Victim's home. *See* Pa.R.A.P. 302(a).

garage of the Property….After contacting relatives of the Victim, who could provide no further information on the Victim's whereabouts, and based on his observation of suspected marijuana [in the Property], C.I. Sweitzer applied for a search warrant that was thereafter approved.

Jeffery Neubauer testified that he and his girlfriend returned [a] lost dog to the Property [at or around the time of the Victim's death, and Appellant] answered the door and took the dog. When asked by Mr. Neubauer's girlfriend if he was "Dennis," [Appellant] replied that he was.

During a post-arrest interview with Detective Martinez, [when Appellant was shown a photograph of the Property,] [Appellant] initially responded that he did not recognize the Property, but [he] eventually relented, admitting that he had been to the Property, but stating that he was there for a yard sale because he conducts a business where he buys and resells guns, coins, and other odds and ends. [Appellant] claimed to investigators that he was granted access to the Property by an unidentified black male going by "Bu," who then sold [Appellant] the items later found in the stolen vehicle.

Based on the evidence and testimony provided at the preliminary hearing [and] the pre-trial suppression hearing[,] [the court] finds that the Commonwealth did fulfill its burden. C.I. Sweitzer's research indicated that the Victim resided at the Property. There was no evidence that [Appellant] leased or that he was licensed to occupy any portion of the Property. [Appellant] was not found in possession of a key to the Property. When asked about the Property, [Appellant] initially denied recognition and then only admitted that he had been to the Property [looking for a yard sale] to conduct limited business in purchasing items for resale. While one may [view] [Appellant's] actions and behavior when Mr. Neubauer and his girlfriend returned the lost dog to the Property as suggestive of some ability to exclude [others] from the premises, his affirmative answer to whether he was the Victim is a clear manifestation that any such ability was solely premised on a falsehood. Finally, Detective Martinez testified that [Appellant] had left a duffle bag with some shoes and a hat at the Property, but this could hardly be construed as [Appellant] storing clothing or other possession at the Property, but mere incidental of the crime alleged.

The expectation of privacy must be more than simply subjective but must be reasonable and legitimate. As the [United

- 23 -

States Supreme Court] noted in **Rakas v. Illinois**, 439 U.S. 128, 99 S.Ct. 421 (1978), "[a] burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'" **Rakas**, 439 U.S. at 143 n.12, 99 S.Ct. at 430 n.12. The resolution of this issue depends upon the totality of the circumstances and ultimately rests upon a balancing of the societal interests involved.

Having found that the Commonwealth sufficiently satisfied its burden, we now must assess whether [Appellant] has presented any evidence to rebut the lack of an expectation of privacy in the Property. As noted, [Appellant] relies [primarily] on an argument that the Commonwealth failed its burden and acknowledges that he has provided nothing to support his own expectation of privacy in the Property. [Appellant] states…that his "motion must be granted, regardless of whether he could ultimately establish a reasonable expectation of privacy." [Appellant's Suppression] Memo at 9. [The trial court] finds this to be unconvincing.

Based upon the totality of the circumstances and balancing, as [the trial court] must, the societal interests involved, the [trial] court finds no evidence to demonstrate [Appellant's] reasonable expectation of privacy in the Property.

Suppression Court Opinion, filed 3/29/21, at 13-15 (footnote added) (some quotation marks and quotations omitted).

We conclude the suppression court's factual findings are supported by the record, and we find no error in its legal analysis. **Yandamuri**, **supra**. The suppression court properly found the Commonwealth produced evidence demonstrating that Appellant lacked a privacy interest in the Victim's Tully Lane home, and Appellant did not rebut this evidence. For example, the Commonwealth produced evidence the Victim resided in the Tully Lane home, and Appellant had no "significant and current interest" in the home. **Govens**, 632 A.2d at 1319. As the suppression court determined, Appellant's

connection to the home was in furtherance of committing the crimes at issue, including the burglary and first-degree killing of the Victim. Certainly, any privacy interest Appellant subjectively demonstrated in the Tully Lane home for the purposes of burglarizing the home and killing the homeowner is not an "expectation…that society is prepared to recognize as reasonable." *Viall*, 890 A.2d at 422. Accordingly, we find the suppression court properly denied Appellant's suppression motion on the basis he did not possess a reasonable expectation of privacy in the searched premises.[9]

For all of the foregoing reasons, we affirm Appellant's judgment of sentence. We direct the parties to attach the trial court's February 27, 2023, opinion in the event of further proceedings in this matter.

Affirmed.

_____

[9] Appellant also contends the warrantless search of the Victim's home was unconstitutional, and all evidence flowing therefrom is "fruit of the poisonous tree," including evidence later seized upon execution of a search warrant. However, we decline to review these issues. *See Enimpah*, *supra*, 106 A.3d at 701-02 (indicating if the evidence of the Commonwealth, the party with the burden of production, shows the defendant lacked a privacy interest, the Commonwealth need prove no more).

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>07/31/2023</u>

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON
: PLEAS OF BERKS COUNTY
: PENNSYLVANIA
:
v. : CRIMINAL DIVISION
: NO. CP-06-CR-0002261-2020
:
RAPHAEL PEREZ-RODRIGUEZ, : M. THERESA JOHNSON,
Appellant. : PRESIDENT JUDGE

**1925(a) OPINION**                                          **February 27, 2023**

Before the court are Appellant's Statement of Errors Complained of on Appeal. For the reasons set forth herein, we find that all alleged errors lack merit.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Raphael Perez-Rodriguez ("Appellant") was charged with Murder of the First Degree[1], Murder of the Second Degree[2], Murder of the Third Degree[3], Burglary[4], Robbery[5], Aggravated Assault[6], two counts of Receiving Stolen Property[7], two counts of Firearms Not to be Carried Without a License[8], Altered, Forged or Counterfeit Documents and Plates[9], Abuse of Corpse[10], Possession of a Controlled Substance[11], and a summary charge of Drivers Required to be Licensed[12]. The charges stemmed from an initial traffic stop of Appellant, which then led to an investigation of the murder of Dennis Fink ("the Victim") and the burglary of the Victim's residence.

Appellant, through Adam Bompadre, Esq. ("Defense Counsel"), filed an omnibus pretrial motion seeking dismissal of the criminal information and suppression of evidence. A hearing on the motion was held on January 25, 2021, and on March 29, 2021, this court denied the motion.

---

[1] 18 Pa.C.S.A. § 2502(a)
[2] 18 Pa.C.S.A. § 2502(b)
[3] 18 Pa.C.S.A. § 2502(c)
[4] 18 Pa.C.S.A. § 3502(a)(1)(i)
[5] 18 Pa.C.S.A. § 3701(a)(1)(i)
[6] 18 Pa.C.S.A. § 2702(a)(1)
[7] 18 Pa.C.S.A. § 3925(a)
[8] 18 Pa.C.S.A. § 6106(a)(1)
[9] 75 Pa.C.S.A. § 7122(1)
[10] 18 Pa.C.S.A. § 5510
[11] 35 P.S. § 780-113(a)(16)
[12] 75 Pa.C.S.A. sec 1501(a)

BERKS COUNTY, PA

2023 FEB 27 PM 12:56

CLERK OF COURTS

Prior to trial, the Commonwealth moved to withdraw the counts of Altered, Forged or Counterfeit Documents and Plates, Abuse of Corpse, Possession of a Controlled Substance, and Drivers Required to be Licensed. The court granted the dismissal.

The matter proceeded to trial on April 18, 2022. The Commonwealth first called the Victim's son, Michael Fink, who testified that his father was a twenty-year veteran of the United States Air Force who lived at 8 Tully Lane, in Reading, Berks County, Pennsylvania. Notes of Testimony of April 18-20, 2022, Trial "Trial N.T." at 105-06. Mr. Fink further noted that his father owned a black Pomeranian dog named "Sophie" and that he drove a Tesla Model S electric vehicle. Trial N.T. at 106-07. Mr. Fink also identified various exhibits, including an Air Force Academy graduation ring, a high school graduation ring, a wedding band, and a turquoise belt, as well as insurance documentation for the rings. *Id.* at 109-10.

Mr. Fink continued that the Victim was active on social media, especially as to the subjects of nutrition and health, including on Facebook. *Id.* at 111-12. Mr. Fink then identified a post that the Victim made on July 16, 2020, at 8:37 a.m. *Id.* at 112.

The Commonwealth next called Officer Eric Koller, an eight-year veteran of the Reading Police Department, who testified that on July 16, 2020, at approximately 7:40 p.m., he was on duty in a marked patrol vehicle when he observed a black Honda CR-V with what appeared to be an altered Minnesota license plate. *Id.* at 118. Officer Koller then initiated a traffic stop on the Honda after running the registration and learning that it was reported stolen out of New Jersey. *Id.* at 118-19. After the driver of the Honda CR-V, later identified as Appellant, exited the vehicle, Officer Koller ordered him to the ground and waited for backup to arrive. *Id.* at 119. Officer Koller reached inside the Honda to turn off the stereo system, which was playing very loud music and when he did so, he observed a small, blue Ziploc bag in the driver's side door containing a white powdery substance and two knives located between the seat and the doorjamb. *Id.* at 120.

The officers on scene proceeded to search the Honda. *Id.* Under the driver's seat, they found two loaded handguns – a 9mm and a .38 revolver. *Id.* at 121. In the cargo area of the Honda, officers found a Remington model 742 30-06 rifle, a Winchester 1400 semiautomatic shotgun, a crossbow, a sword, $CO_2$ cartridges in an envelope with the Victim's name on the label, and various debit and credit cards in the Victim's name. *Id.* at 122-23. Appellant was taken into custody and the Honda was towed to the Department's sally port. *Id.* at 121-23.

2

Criminal Investigator Eric Sweitzer ("C.I. Sweitzer") of the Reading Police Department next testified that on July 16, 2020, Officer Koller informed him that during a traffic stop, several items with the Victim's name had been located. *Id.* at 129-30. C.I. Sweitzer performed some research and found an individual by the name of Dennis Fink who lived just outside the City of Reading, in Bern Township. *Id.* at 130. C.I. Sweitzer and another criminal investigator, David Lehman, then traveled to the Victim's residence, at 8 Tully Lane, Reading, Pennsylvania ("the Residence") in an attempt to make contact. *Id.* at 130-31.

As the investigators pulled into the driveway of the Residence, C.I. Sweitzer noticed that the recycling can was located at the end of the driveway and that the exterior lights of the Residence were on. *Id.* at 132. Upon arriving at the Residence, C.I. Sweitzer rang the doorbell and knocked on the front door several times with no response. *Id.* at 131. After several minutes with no response, C.I. Sweitzer left his business card in the door in the hopes that someone would contact him. *Id.* at 132.

The next day, after receiving no contact from anyone regarding the Residence, C.I. Sweitzer returned to the Residence, with Criminal Investigator Errington and found that his business card was still stuck in the door, the recycling can was still at the edge of the driveway, the same exterior lights were on, and a package had been delivered. *Id.* at 133. C.I. Sweitzer also observed that the garage door was slightly ajar, and he could see that there was a vehicle inside the garage. *Id.* at 133. C.I. Sweitzer knocked on the front door several times, with no response, and then moved to the rear of the Residence and knocked on the rear doors, but no one answered. *Id.* at 134. C.I. Sweitzer then began checking the doors and windows and found an unlocked door through a screened-in porch but did not proceed into the house. *Id.* at 135. Instead, C.I. Sweitzer contacted the Bern Township Police Department ("Bern P.D."), in whose jurisdiction the Residence was located. *Id.* at 135.

Once a patrolman from the Bern P.D. arrived, C.I. Sweitzer, along with the patrolman and C.I. Errington, proceeded to open the door slightly and announced their presence. *Id.* at 135-36. Hearing no response, C.I. Sweitzer entered the Residence through the kitchen and observed a small black dog in a cage with a bowl of water and acting alert and normal. *Id.* at 136. C.I. Sweitzer described the Residence as being unkept, with mess and clutter, but also noted that items looked out of place. *Id.* C.I. Sweitzer noted that several cabinet doors in the kitchen were left open, and

3

that the lights were on in the closets throughout the Residence, and it appeared as if both the cabinets and the closets had been gone through and items removed. *Id.* at 136-37. The investigators moved into the garage and observed that the lights were on and a blue Tesla was parked in the garage. *Id.* at 137. C.I. Sweitzer testified that he decided to leave and try to locate a family member of the Victim, but as he was leaving the Residence, he noticed a duffle bag with a flat brim hat that had a marijuana leave embroidered on the hat. *Id.* at 137, 144. C.I. Sweitzer said that the hat caught his eye because it did not fit in with the décor of the Residence and was not something he would anticipate the Victim having in his possession. *Id.* Apart from the hat, C.I. Sweitzer could also see glass jars containing suspected marijuana. *Id.* at 138.

C.I. Sweitzer then made attempts to contact family members of the Victim. *Id.* However, none of the family members he contacted had any information on the Victim's whereabouts. *Id.* C.I. Sweitzer asked that a further search of the Honda be performed and began preparing a search warrant for the duffle bag at the Residence. *Id.*

C.I. Sweitzer returned later that evening with personnel from the Berks County District Attorney's Office, and before entering the Residence, he could detect the smell of decomposition emanating from the wooded area behind the Residence. *Id.* at 139. Sergeant Schade, who had accompanied C.I. Sweitzer, then located the Victim's decomposing body *Id.*

Julie Patton next testified that in the summer of 2020, she was living with her partner, Mike Gamber, at 4 Allison Road in Reading, Pennsylvania, which is located next to Tully Lane, and that she knew the Victim from the neighborhood. *Id.* at 147-48. Ms. Patton also knew that the Victim had a small, black Schipperke dog. *Id.* at 148-49.

On the morning of July 16, 2020, Ms. Patton noticed the Victim's dog running loose in the neighborhood and decided to return the dog with Mr. Gamber. *Id.* at 149. Arriving at the Residence at approximately 9:30 a.m., Ms. Patton observed that the screens were open and so she began to yell the Victim's name through the open windows. *Id.* at 149-50. Ms. Patton rang the doorbell and knocked on the door, but there was no response, and she assumed that the Victim was out looking for the dog. *Id.* at 150. Ms. Patton further noticed a dark SUV, that she did not recognize, parked in the driveway of the Residence. *Id.* With no answer, Ms. Patton then took the dog to her sister, Marilyn James' house with instructions to see if the Victim was home later. *Id.* at 150-51. Ms.

4

Patton noted that she did not notice any yard sales occurring on the morning of July 16, 2020, and did not see any items on the lawn of the Residence. *Id.* at 151.

Marilyn James, Ms. Patton's sister and neighbor, knew the Victim from the neighborhood and knew that he had a small, black Schipperke dog. *Id.* at 153. On July 16, 2020, while at a friend's house, Ms. James heard from Ms. Patton regarding finding the Victim's dog and her unsuccessful efforts to contact the Victim. *Id.* at 154. On her way home at approximately 10:00 a.m., Ms. James stopped at the Residence to check on the Victim, but when she knocked on the door, an individual – a Hispanic male with dark brown hair - that was not the Victim answered the door. *Id.* at 154-55. Ms. James described the individual as wearing a t-shirt, a mask, shorts, and either barefooted or wearing flip flops. *Id.* at 156. Ms. James further noted that she knew the Victim had been a foster parent to several teenagers, so she did not think that the individual was not supposed to be at the Residence. *Id.* She noticed that a dark SUV was parked on the side of the Residence. *Id.* at 155.

Ms. James asked the individual if the Victim's dog was missing, and the individual answered in the affirmative. *Id.* Ms. James then retrieved the dog from her home and returned to the Residence with the dog, and the individual took the dog from her. *Id.* She noted that the exchange when she returned the dog seemed "a little bit weird," as the individual only opened the door about forty-five degrees and did not seem excited or relieved at the return of the dog. *Id.* at 157. Ms. James likewise confirmed that she did not see any items on the lawn of the Residence or that any yard sales were occurring in the neighborhood. *Id.*

Jeffrey Neubauer testified that in July of 2020, he lived with his partner, Cheryl Takach, at 1703 Golf Road, in Bern Township, which is about a block and a half from the Residence. *Id.* at 159-60. On the morning of July 16, 2020, Mr. Neubauer was painting his front porch when two young girls approached him with a small, dark-colored dog and asked if it was his dog. *Id.* at 160. Mr. Neubauer did not recognize the dog but took the dog inside and began to figure out the owner of the dog based on information from the dog's collar. *Id.* at 160-61. He was able to find out that the dog's owner lived at the Residence, and so he took the dog to the Residence. *Id.*

As Mr. Neubauer and Ms. Takach approached the Residence, Mr. Neubauer described the grass as overgrown with weeds and a flower bed that looked unkempt. *Id.* at 161-62. When they approached and knocked on the door, an individual who Mr. Neubauer described as being a tall,

5

Hispanic man wearing beige/white cargo shorts, a tank top, no shoes, and a ball cap, answered the door. *Id.* at 162. Mr. Neubauer further noted that the individual's feet appeared to be dirty and that the individual's undergarments were exposed, and he could see that the brand of his underwear was Tommy Hilfiger. *Id.* at 162-63. When the door opened, Mr. Neubauer noticed some items on the floor including a bow and arrow and a can of Mr. Bubbles bathroom spray cleaner. *Id.* at 164.

Ms. Takach asked the individual if the dog was his and the individual answered in the affirmative. *Id.* at 163. Ms. Takach then asked the individual if he was Dennis and he stated that he was. *Id.* at 163. Mr. Neubauer stated that he found the exchange odd as the individual did not seem grateful to have the dog returned or even aware that the dog was missing. *Id.* at 164. The next day, in speaking with investigators, Mr. Neubauer was presented with a photo array lineup and indicated on a photograph of Appellant. *Id.* at 165; Comm.'s Ex. 11.

Timothy Koch testified that in the summer of 2020, he lived at 7 Allison Road in Bern Township, which was next door to the Residence, and that he knew the Victim, but not that well. *Id.* at 170-71. Mr. Koch was not aware that the Victim owned a dog but noticed a small black animal in his back yard on the evening of July 16, 2020. *Id.* at 171. The next morning, Mr. Koch saw the same dog loose in the neighborhood and nearly ran the dog over with his car. *Id.*

In the early evening of July 16, 2020, Mr. Koch observed someone walking around the garage of the Residence that he did not recognize. *Id.* at 172. Mr. Koch described the individual as a male wearing a light blue shirt. *Id.* Mr. Koch further stated that he did not see any items strewn on the lawn as if a yard sale were occurring on that day. *Id.* at 173.

The Commonwealth next called Officer Katelyn Super ("Officer Super"), a three-year veteran of the Reading Police Department, who testified that on July 16, 2020, at approximately 7:40 p.m., she was on duty when she responded to a traffic stop on a possible stolen vehicle. *Id.* at 175-76. When she arrived on scene, Officer Super observed a black Honda CR-V with a Minnesota license plate that had a number that had been altered. *Id.* at 176. Officer Super was tasked with photographing the Honda while she and Officer Koller began to search the vehicle. *Id.* at 177. The Commonwealth introduced photographs taken during the search into evidence depicting items found, including a baggie containing suspected narcotics, a knife, a cell phone, a loaded Heckler and Koch 9mm handgun, a loaded .38 Special revolver, a business card with the Victim's name on it, a Remington rifle, a Winchester shotgun, a box containing empty casings and

6

shotgun rounds, a bag containing various boxes of ammunition, a bow and arrow, and a business card from a T-Mobile store in Paterson, New Jersey. *Id.* at 182-85. The evidence was left in the Honda and the vehicle was then towed to the sally port at City Hall with an officer escort to ensure chain of custody. *Id.* at 185.

Officer Ryan Solecki ("Officer Solecki"), a five-year veteran of the Reading Police Department testified that July 16, 2020, at approximately 8:00 p.m., he was on duty when he was dispatched to a traffic stop in progress. *Id.* at 188-89. Arriving on scene, Officer Solecki observed a Honda CR-V that was being searched by officers on scene, and he saw that the driver had been removed and was sitting on the sidewalk. *Id.* Officer Solecki described the inside of the vehicle appearing as if someone had been living in the vehicle, with a lot of objects, and he specifically remembered two Army green duffel bags. *Id.* at 189. After the search had been completed, Officer Solecki was tasked with watching the Honda as the towing company hitched the vehicle and then following as the vehicle was transported back to the sally port at City Hall, and then secured in the garage. *Id.* at 189-90.

Criminal Investigator Steve Valdez ("C.I. Valdez"), an eight-year veteran of the Reading Police Department, testified that on July 17, 2020, he was contacted by C.I. Sweitzer to assist in an investigation, and to accompany Officer James Yeasted in the search of a black Honda CR-V in the garage at City Hall. *Id.* at 191-92. During this search, C.I. Valdez found several knives, a machete, and several financial cards with the Victim's name on them. *Id.* at 194-95.

The Commonwealth next called Dr. Neil Hoffman, M.D. ("Dr. Hoffman"), who was qualified as an expert in the field of forensic pathology. *Id.* at 211-16. Dr. Hoffman performed an autopsy on the Victim on July 19, 2020, and produced a report of the autopsy, which was submitted into evidence. *Id.* at 216-17; Comm.'s Ex. 116. Dr. Hoffman's autopsy report indicated that the Victim's death was caused by exsanguination, or bleeding outside of the body, and internal bleeding due to multiple stab wounds, with contributory factors of cardiomyopathy and osteopenia. *Id.* at 218-19. Dr. Hoffman explained that cardiomyopathy is a disease with multiple causes, in which "the heart muscle ceases to function normally and its contraction are not as efficient." *Id.* at 219. Dr. Hoffman further noted that a contributory cause meant that the condition "didn't really start the cascade of causation in this case, but probably means that [the Victim] was less able to defend himself from the person who was wielding the knife or wielding the weapon," and that the

7

Victim "was less able to withstand the effects of the of those injuries that were inflicted by the weapon." *Id.* Likewise, Dr. Hoffman described osteopenia as a condition in which "the bones have less calcium and less protein, and where they become more easily fractured." *Id.* at 220. Dr. Hoffman continued that the injuries he observed included stab wounds that penetrated into bone, which then tore into the pleural cavity on the right side of the Victim's chest. *Id.* This "allowed bleeding into the inside of the chest[,] which would [*sic*] made it more immediately effective or to disable and kill the man." *Id.*

Dr. Hoffman then explained that generally, he will list the injuries to a victim in order of severity. *Id.* The first injury was a right to left stab wound to the Victim's chest in the area above the collar bone on the right side with "a wound path that went into the base of the neck and then behind the collar bone and sternum," and into the topmost area of the chest. *Id.* at 221. This jab sliced one of the largest arteries supplying blood to both the neck and brain and caused a complex fracture to the collarbone and right first rib. *Id.* The injury would also result in blood from the cut artery to fill the chest cavity. *Id.* The next wound to the Victim was a stab wound to the left front side of the neck that punctured the Victim's larynx and would have impeded his ability to breathe. *Id.* at 222-23. This wound was oriented left to right. *Id.* at 223. The third wound was a slice to the Victim's cheek that "perforated the very thin bone of the maxilla." *Id.* at 224. The wound was deep and oriented left to right. *Id.*

The fourth stab wound was to the back of the left side of the chest and was transversely oriented, meaning that it "went slightly from left to right but upward as well." *Id.* at 224-25. This wound fractured the Victim's tenth rib. *Id.* at 225. The fifth wound to the Victim was to the area below the left collarbone. *Id.* at 225-26. The stab "proceeded approximately three inches down the left side of the chest," and into the musculature of the chest. *Id.* at 226. The Victim's sixth wound was a stab wound to the lower chest area that moves from front to back. *Id.* The stab sliced between the sixth and seventh rib and into the pleura that lines the chest cavity but did not go into the lung. *Id.* Dr. Hoffman clarified that the direction of the different wounds – that there are multiple angles and positions – is indicative of one or both bodies being in motion at the time of infliction. *Id.*

Dr. Hoffman explained that the injuries he observed would have resulted in both external and internal bleeding. *Id.* at 226-27. Dr. Hoffman also noted that there was blunt impact observed

8

resulting in a fracture to the left forearm, which is most commonly caused by a person trying to break their fall to the ground. *Id.* at 227. Dr. Hoffman also noted that there were abrasions to the hands and to the knees of the Victim. *Id.* at 227-28. While he could not determine conclusively which abrasions to the Victim's hands may have been caused postmortem, Dr. Hoffman stated that the knee abrasions occurred before death and were consistent with the Victim moving his legs across a rough surface as a result of either falling or being pushed or by having someone on top of him. *Id.* at 228-29. Dr. Hoffman also found abrasions on the Victim's chest that were consistent with falling or being pushed and were large areas of irregularities that would result from bushes, branches, or rocks. *Id.* at 229. Dr. Hoffman continued that the abrasions suggest that the Victim had both fallen and then was moving across a rough surface. *Id.* at 230. The Victim also had evidence of bruising of the chest and fracturing of ribs that "were caused by heavyweight or an impact being placed on the front of the chest or with a heavyweight or impact on the back of the chest with the chest being supported by the ground." *Id.* at 231.

Finally, Dr. Hoffman described that the Victim's body was in a state of moderate decomposition and that there was extensive maggot activity in many of the wounds. *Id.* at 231-32. Based on the maggot activity, and other information regarding body and scene conditions, Dr. Hoffman opined that the Victim's death occurred approximately 30 to 48 hours prior to the discovery of the body. *Id.* at 233. Dr. Hoffman postulated, based in part on information provided by law enforcement, that the time of death of the Victim was between 8:45 a.m. and 12:00 p.m. on July 16, 2020. *Id.* Moreover, toxicology results indicated "negative for various drugs or substances of abuse." *Id.* at 234.

Dr. Hoffman acknowledged on cross-examination that he was not provided any of the knives from the Victim's' home to compare against the stab wounds. *Id.* at 245. However, Dr. Hoffman concluded that the stab wounds were caused by "a sharp-edged instrument like a knife. It had a blade length on the order of three inches. The blade width was approximately one half inches long." *Id.* at 246.

Sarah Kase, a serologist with the Bethlehem Crime Lab of the Pennsylvania State Police, next testified that she "analyze[s] items of evidence in serology for the presence of body fluids; mainly bloods, semen, saliva, feces, and urine," and that she "prepare[s] probative samples for

9

DNA and have those sent to the DNA lab. *Id.* at 248. She also noted that she will examine hairs to determine whether they are animal or human. *Id.*

Ms. Kase then testified to the report that she authored regarding various items of evidence that were collected and sent to her for testing and analysis. *Id.* at 249-50; Comm.'s Ex. 119. Ms. Kase first concluded that a swab from the basement sliding glass door of the Residence and a dried blood sample from the Victim were not processed for serology and were repackaged solely for DNA testing. *Id.* at 253. Ms. Kase next concluded that chemical testing indicated the presence of blood on the Victim's left-hand fingernail. *Id.* at 254. On the Victim's right-hand fingernail sample, there was insufficient quantity of the sample to conduct testing as to the identification of blood, but Ms. Kase did identify insect-like debris. *Id.* at 257-58.

Ms. Kase concluded that a black and orange face mask found at the Residence was tested and confirmed the presence of saliva on the mask. *Id.* at 258. Ms. Kase testified that there was an insufficient quantity of a sample on a pair of blue and black gloves to conduct confirmatory testing for blood and the sample was packaged for return. *Id.* at 259. There were blood stains identified on the heel and bottom left side and shoelaces of a left foot Adidas Boost sneaker and samples were swabbed and sent for DNA analysis. *Id.* at 259-60. No blood was detected on the blade or handle of a kitchen knife, a folding knife, and another knife that were collected, but swabs were made and forwarded for DNA analysis. *Id.* at 260-61. Chemical testing indicated the presence of blood was detected on the zipper area, front leg area, and back right pocket of Appellant's shorts, but there was an insufficient quantity of the sample to conduct further testing for identification. *Id.* at 261. Chemical testing on a blue Versace shirt likewise indicated the presence of blood on the outside front and inside left sleeve cuff, but the sample was insufficient for identification of blood. *Id.* at 262. Ms. Kase explained that even where there was an insufficient sample for blood identification, the samples were repackaged and forwarded as DNA testing and analysis may still be performed on the sample. *Id.*

Officer James Yeasted, a ten-year veteran of the Reading Police Department testified that he is detailed to the crime scene unit, which entails processing evidence and responding to major homicide and shootings cases. *Id.* at 273-74. On July 17, 2020, Officer Yeasted was contacted by C.I. Sweitzer regarding an ongoing investigation and requested Officer Yeasted to assist in conducting a search of a Honda CR-V. *Id.* at 274. Officer Yeasted and Criminal Investigator Steve

10

Valdez conducted the search of the Honda. *Id.* Officer Yeasted described the protocol of the search, including taking photographs of the exterior beginning at the driver's side and then proceeding counterclockwise around the vehicle and do the same thing again with the doors to the vehicle opened. *Id.* Once photographs are taken, collection of evidence will begin. *Id.* at 275. Officer Yeasted described the interior of the Honda as being very cluttered. *Id.* The Commonwealth then introduced photographs taken during the search of the Honda. *Id.* at 277; Comm.'s Exs. 39-103. During the search of the Honda, Office Yeasted testified that they found one knife underneath the driver's side seat, and another jammed in the side, a purple Metro T-Mobile bag in the rear driver's side, a green military style bag in the passenger rear seat, a cell phone in the center console area, a picture of an Egyptian frame on the rear passenger floor. *Id.* at 278-79; Comm.'s Exs. 41-47. A metal box was found on the front passenger seat, which contained various papers and coins. *Id.* at 279; Comm.'s Exs. 49-50.

Boxes of ammunition and two laptops were found on the rear seat, with one of the laptops having a sticker with the Victim's name on it. *Id.* at 280; Comm.'s Exs. 56-60. A beige pouch was found in the interior of the driver's side door that contained a key holder with the Victim's name on it. *Id.* at 281; Comm.'s Exs. 63-64. In the same door pocket, Officer Yeasted located a rifle cartridge and a spent cartridge underneath the driver's side seat. *Id.* at 281-82; Comm.'s Ex. 66, 68. Business cards with the Victim's name and address on them were located in the driver's side door as well. *Id.* at 282; Comm's. Exs. 69-70. A machete in a sheath was found on the floor of the front driver's side area. *Id.*; Comm.'s Exs. 71-72.

In the rear hatch trunk of the Honda were found a night stick with baton, a wooden model plane, a digital camera, and a manilla envelope with the Victim's name printed on the side. *Id.* at 282-83; Comm.'s Exs. 73-78. Inside of the envelope were found three credit cards and a debit card with the Victim's name on them and C02 cartridges. *Id.* at 283-84; Comm.'s Ex. 79-81. A carpet knife, two arrows, a sword, and a crossbow were also found in the trunk. *Id.* at 284-85; Comm.'s Exs. 83-89. Two bags – one red and one tan – were found in the trunk of the Honda. *Id.* at 285-86; Comm.'s Exs. 92-92. A box found was found in the rear passenger side that contained two pistol magazines and shotgun cartridges. *Id.* at 286; Comm.'s Exs. 93-94.

11

A notebook found in the front passenger glove box included the Victim's name inside. *Id.* at 286; Comm.'s Exs. 95-96. On the floor of the front passenger area was a Blue Cross/Blue Shield of Texas card with the Victim's name on it. *Id.*; Comm.'s Exs. 100-01.

Officer Yeasted testified that two days later, on July 19, 2020, he met with Detectives Martinez, Shade, and Rentschler of the Berks County Detectives Office, and Bern Township Detective Sergeant Brett Forry in the evidence section. *Id.* at 287-88. At that time, the three knives found in the Honda were relinquished into the control of the detectives. *Id.*

On July 28, 2020, Officer Yeasted examined the contents of the bags found in the Honda. *Id.* at 294. In the red bag, Officer Yeasted found a hatchet, first aid kit, cell phone, flip phone, binoculars, several wristwatches, and two compasses. *Id.* at 295; Comm.'s Ex. 105. Miscellaneous items, including a toy airplane, two straight-edge knives, and three folding knives, were found in the beige bag retrieved from the Honda. *Id.* at 295; Comm.'s Exs. 106-107. In the green duffel bag with the Victim's last name on it were found various boxes of firearm ammunition, television remotes, and toy planes. *Id.* at 296; Comm.'s Exs. 108-110. On August 5, 2020, Officer Yeasted and his supervisor met with Detectives Martinez and Shade at the evidence section to transfer all items collected as evidence from the Honda. *Id.* at 297-98.

Officer Yeasted further described two cell phones that were found during the search of the Honda. *Id.* at 299-300. The first was a gray LG cell phone that was found on the front dash of the Honda. *Id.* at 299, 303; Comm.'s Ex. 236. The second was a black cell phone with a gray cover that was found on the two cup holders attached to the center console of the Honda. *Id.* at 300, 303; Comm.'s Ex. 237.

Sergeant Andrew Fasolka ("Sergeant Fasolka"), a six-year veteran of the Berks County Sheriff's Department, testified that on July 16, 2020, he was working in the booking center of the Sherriff's office when Appellant was processed through. *Id.* at 307-09; Comm.'s Ex. 122. Sergeant Fasolka continued that, as part of the booking process, an inventory was taken of the personal items Appellant had on his person, which included a belt, a watch, four rings, four necklaces, one hat, one toilet cleaner pack, one lighter, one MP3 player, one set of keys, miscellaneous papers, one tie pin, and $15.25 in cash and coins. *Id.* at 309; Comm.'s Ex. 122.

Sergeant Gerardo Vega ("Sergeant Vega"), a thirty-year law enforcement veteran, and a detective with the Berks County Detectives' Office testified that on July 17, 2020, he responded

to a call at 8 Tully Lane in Bern Township, Berks County, where he was briefed as to attempts to ascertain items in the stolen vehicle that Appellant was driving at the time of his arrest. *Id.* at 311-12. Sergeant Vega proceeded to the Berks County Sherriff's Office where he seized the clothing that Appellant was wearing at the time of his arrest for evidence purposes. *Id.* at 312. At the time, Sergeant Vega took photographs depicting Appellant in the clothing that was later seized. *Id.* at 313-14; Comm.'s Ex. 240. The clothing seized included a black muscle shirt, a pair of tan/beige shorts, a pair of flip flops, and later, a pair of light blue Tommy Hilfiger underwear. *Id.* at 313-18.

On August 11, 2020, after applying for and receiving a search warrant, Sergeant Vega proceeded to the Berks County Jail System ("BCJS"), where Appellant was being held, and seized the items that were collected upon his arrest. *Id.* at 321. Sergeant Vega specified that one of the rings seized was an Air Force graduation ring and another was a high school graduation ring, along with a U.S. Air Force hat. *Id.* at 323-24. The set of keys seized from Appellant included key fobs for a Ford and a Tesla motor vehicle. *Id.* at 326. Sergeant Vega further noted that while the device seized was listed as an MP3 player, it was actually a recorder. *Id.* at 329. Sergeant Vega stated that the Tesla key fob was transferred to Detective Martinez to determine whether the fob was associated with the Tesla at the Victim's Residence. *Id.* at 331. Sergeant Vega observed that they did activate the Tesla at the Residence. *Id.*

Isam Al-Barghouthy testified that around July 14, 2020, he lived at 14 River Road, Elmwood Park, New Jersey, and that he owned a 2011 Honda CR-V and a 2006 Toyota Camry. *Id.* at 338-39. Mr. Al-Barghouthy stated that he purchased the Honda approximately six to eight months prior in New York and that he placed his Minnesota license plates on the Honda. *Id.* at 339. Mr. Al-Barghouthy had lived in Minnesota for seventeen years and had planned on moving back, so he registered the Honda in Minnesota. *Id.* at 339-40. On the evening of July 14, 2020, Mr. Al-Barghouthy came home late and parked the Honda, which his son had just cleaned, in his driveway. *Id.* at 340. The next morning, on July 15, 2020, he noticed that the Honda was gone and immediately reported it stolen. *Id.* at 340-41. Mr. Al-Barghouthy also testified that the license plate that he had on the Honda ended in a 9. *Id.* at 341. Mr. Al-Barghouthy stated that when he last drove the Honda, there were no weapons, including firearms or knives, inside of the vehicle. *Id.* at 341-32.

13

Anne Traceski testified that in July of 2020, she resided in Lancaster County, Pennsylvania, with her husband, Thomas, and her son, Nathan. *Id.* at 344-45. Ms. Traceski stated that she was unfamiliar with the Residence and did not know the Victim. *Id.* at 345. In October of 2021, the Berks County Detectives' Office contacted Ms. Traceski regarding the fact that her Google account had appeared in a search warrant. *Id.* at 344. Ms. Traceski testified that on July 16, 2020, she had been walking the trails around the Reading Museum with her son. *Id.* at 345-46. After walking the trail, Ms. Traceski and her son went to eat at Elevation Burger. *Id.* at 346.

Sergeant Albert Schade ("Sergeant Schade"), a twenty-three-year veteran of the Berks County Forensic Services Unit, testified that on July 17, 2020, he proceeded to the Residence with C.I. Sweitzer regarding the investigation of recovered property. *Id.* at 349-50. Upon arrival, they proceeded to the back door, where Sergeant Schade stated that he "smelled something decomposing in the back." *Id.* at 350. As a result of detecting the odor, Sergeant Schade and C.I. Sweitzer started down a foot trail in the back yard that led toward the river. *Id.* at 351. They located the Victim's body along the left side of the trail situated approximately ten feet from the property line and about ninety-six feet from the Residence. *Id.* at 351-52. Once the Victim's body was located, Sergeant Schade called Lieutenant Shenk and had the Reading Police contact the Berks County Coroner. *Id.* at 352.

Sergeant Schade described the body as being covered by bamboo and indicated that there had been significant insect damage to the face and chest. *Id.* To identify the body, they took a print of the Victim's right thumb that was later verified through a fingerprint card from the Victim's military service. *Id.* at 351-52. The Victim's body was then removed from the Residence. *Id.* at 352.

Sergeant Schade returned to the Residence on July 18, 2020, for processing of the scene. *Id.* at 357. Sergeant Schade described the Residence to be unkempt and stated that it looked as if it had not been cleaned in a while. *Id.* Further, Sergeant Schade noted that the Residence appeared to have been ransacked with dresser drawers pulled out and items thrown on the floor in the bedrooms. *Id.* at 357-58. Sergeant Schade testified that while processing the scene, he did not find blood evidence inside of the Residence. *Id.* at 358-59. While outside of the Residence, Sergeant Schade observed that a garden hose on the steps that was leaking. *Id.* at 361. During Sergeant Schade's testimony, the Commonwealth presented photographs that he took during his processing

14

of the scene while Sergeant Schade narrated the descriptions of the photographs. *Id.* at 359-73; Comm.'s Exs. 150-234. When asked what he was specifically looking for during his walkthrough, Sergeant Schade responded: "I was looking for anything broken, furniture that was out of place, or I was looking for blood. So I didn't know if he was shot or whatever, So I was looking for casings, I was looking for anything that would have given me a sign of where the homicide actually happened." *Id.* at 373-74. Sergeant Schade continued that he had not found anything of interest. *Id.* at 374.

Sergeant Schade testified that he collected a pair of Adidas Boost shoes and the black and orange facemask from the Residence. *Id.* at 375-77. After learning of the autopsy results, Sergeant Schade returned to the Residence to search for possible knives, but no weapons were found at the Residence. *Id.* at 379-81. Furthermore, no indicia of blood was found at the Residence. *Id.* at 381. Sergeant Schade also met with Officer Yeasted and collected the evidence retrieved from the search of the Honda. *Id.* at 379-80.

On July 23, 2020, Sergeant Schade, along with Detective Rentschler, conducted a search of the Honda at the forensics lab garage. *Id.* at 383-84. During the search of the Honda, they collected a blue Versace shirt, which Sergeant Schade believed might had blood evidence on it, a Metro T-Mobile bag containing various items belonging to the registered owner of the Honda, and a paper receipt for Appellant for an LG Aristo 4 cell phone activated on July 15, 2020. *Id.* at 385-86.

Detective Kyle Rentschler ("Detective Rentschler"), a two-year veteran of the Berks County Detective's Officer who has been in law enforcement for twenty-two years, testified that on July 17, 2020, he was called to the Residence by Sergeant Schade to process the crime scene. *Id.* at 399. Detective Rentschler took photographs at the Residence along with Sergeant Schade. *Id.* at 401-02. Detective Rentschler also assisted in sealing the Victim's body in the body bag and noted that the Victim's left wrist was either dislocated or broken. *Id.* at 404.

The next day, on July 18, 2020, Detective Rentschler returned to the Residence with Sergeant Schade and took further photographs of the Residence. *Id.* at 404-07. Included therein were photographs of the alarm panel and door chime that were ripped off of the wall and laying on the floor. *Id.* at 406-07; Comm.'s Exs. 261-265. While at the Residence, Detective Rentschler noted that the garage doors were unlatched so that the doors could be opened freely. *Id.* at 408-09.

15

Detective Rentschler further observed that the Residence appeared very messy and dirty and that it looked like items had been rummaged through, that closets and drawers were opened, and clothes were strewn about. *Id* at 409. Detective Rentschler also pulled a partial palmprint and swabbed DNA from a sliding glass door in the basement. *Id.* at 410.

On July 19, 2020, Detective Rentschler returned to the Residence with Sergeant Schade to search for blood or other related evidence. *Id.* at 411. However, they found no such evidence. *Id.* Detective Rentschler also participated in the search of the Honda during which he collected the blue Versace shirt with suspected blood on it. *Id.* at 412-13.

On July 21, 2020, Detective Rentschler, along with Sergeant Schade, reviewed and took further photographs of the collected evidence form the Residence and the Honda at the forensic science unit. *Id.* at 414. A Baylor college of medicine bag was recovered from the kitchen at the Residence that contained a pair of Adidas sneakers, a piece of scuba gear, binoculars, a sock, a cell phone, a Crown Royal bag, a possible hard drive, and a bottle of suspected marijuana. *Id.* at 415-16. Detective Rentschler took a closer photograph of suspected blood on the heel of the Adidas sneaker. *Id.* at 415; Comm.'s Ex. 273. A red and black hat with a depiction of a marijuana leaf was also in the bag. *Id.* at 417-18. A wallet was found and photographed, which included a debit card, a credit card, blank checks, a vehicle registration card, a Medicare insurance card, and a USAA vehicle insurance card for a 2017 Tesla all in the Victim's name. *Id.* at 416-17; Comm.'s Exs. 276-281. After photographing the evidence, Detective Rentschler testified that he secured the evidence in proper packaging as per protocol. *Id.* at 417-19.

On cross-examination, Detective Rentschler admitted that examined the alarm panel for fingerprints but found no latent prints. *Id.* at 422. Detective Rentschler further reiterated that after testing throughout the Residence, both inside and outside, there were no signs of blood found. *Id.* at 423-24.

Taylor Richart, a forensic DNA[13] scientist with the Pennsylvania State Police, who was qualified as an expert in DNA profiling, first explained the process of extracting DNA from bodily fluids. *Id.* at 432-36. Ms. Richart produced a lab report based on her analysis of samples provided, including a dried blood sample from the Victim, a buccal swab from Appellant, two swabs from

---

[13] Deoxyribonucleic Acid.

the basement sliding glass door, left- and right-hand fingernail clippings from the Victim, a piece of the orange and black mask, a swab from the heel of the Adidas sneaker, two swabs from inside heel and tongue of the Adidas sneaker, swabs from the blade and handle of the kitchen knife collected, swabs from the blade and handle of another knife collected, swabs from the blade and handle of the folding knife collected, a piece of the zipper area from the shorts Appellant was wearing, and a piece cut from the blue Versace shirt. *Id.* at 439-42.

Ms. Richart first noted that the swabs received from the blade of the kitchen knife, the blade of the second knife, the blade and handle of the folding knife, and the basement sliding glass door provided an insufficient quantity of DNA. *Id.* at 444-45. Therefore, she was not able to provide an interpretable profile based on the samples provided. *Id.*

Ms. Richart continued that the nail clippings from both the left and right hand of the Victim were matched to the DNA profile of the Victim. *Id.* at 445. This confirmed that the samples were provided from the same person. *Id.*

Next, Ms. Richart concluded that the sample from the black and orange mask provided a DNA profile consistent with a mixture of two individuals. *Id.* at 445-46. Moreover, Appellant could not be excluded as a potential contributor indicating that it is 130 octillion[14] more likely that it originated from Appellant and another unknown individual than from two unknown persons. *Id.* at 446. Plainly, Ms. Richart indicated that his meant that it was highly likely that Appellant was one of the contributors to the DNA profile. *Id.* at 447. It was further determined that the Victim could not be included as a contributor. *Id.*

Next, the swab from the heel and left side of the left Adidas sneaker yielded a result that neither Appellant nor the Victim could be excluded as contributors to the profile. *Id.* It was determined that the Victim was 110 octillion more times likely a contributor and Appellant was 1.5 million times more likely a contributor than either individual against two unknown individuals. *Id.* at 447-48. Likewise, there were results consistent with a profile from four individuals derived from the samples from the inside heel and tongue of the Adidas sneaker and both Appellant and the Victim could not be excluded as contributors. *Id.* at 449. The profile was 60 billion times more

---

[14] Ms. Richart explained that an octillion is a number followed by twenty-seven zeros.

likely to have originated from the Victim and 20 octillion times more likely to have originated from Appellant than from either contributor with three other unknow individuals. *Id.*

The swab from the handle of the kitchen knife yielded a DNA prolife consistent with three individuals. *Id.* at 450. Appellant was determined to be 26 sextillion[15] more times likely a contributor to the profile than against three unknown individuals. *Id.* The Victim could not be included as a contributor. *Id.* A sample from the second knife was consistent with a DNA profile consistent with two individuals. *Id.* at 450-51. Appellant could not be excluded as a contributor with a factor of 68 billion more times likely he was a contributor than against two unknown individuals. *Id.* at 450. The Victim could not be included as a contributor. *Id.* at 451. Also included in the sample swab was an additional allele, but Ms. Richart stated that there was insufficient DNA material to interpret results. *Id.* at 450-51.

The cut sample from the pair of shorts yielded a DNA profile consistent with a mixture of three individuals. *Id.* Both Appellant and the Victim could not be excluded as contributors. *Id.* at 451. Ms. Richart noted that the analysis of the shorts sample was distinct because Appellant was in possession of the shorts when they were collected, so he was assumed as a contributor to the DNA profile. *Id.* at 451-52.

The sample from the blue Versace polo shirt was tested and a DNA profile consistent with a mixture of two individuals was obtained. *Id.* at 452. Appellant and the Victim could not be excluded as contributors. *Id.* The profile indicated that it was 85 octillion times more likely to have originated from the Victim and an unknown individual, and 4.9 million more times likely to have originated from Appellant and an unknown individual than as against two unknown individuals. *Id.*

Jennifer Bracamontes, a DNA analyst with Cybergenetics, a Pittsburgh-based technology company that specializes in computer DNA analysis and probabilistic genotyping, who was qualified as an expert in DNA analysis, testified that Cybergenetics uses TrueAllele, which is "a computer system that takes DNA data from what is produced by laboratories that is from physical evidence items. *Id.* at 477-83. The system then separates out DNA profiles from the evidence and compares those profiles to known standards to calculate match statistics. *Id.* at 483. TrueAllele

---

[15] M.s Richart testified that a sextillion is a number followed by twenty-one zeros.

18

had been tested in over forty validation studies with results likewise published and validated in peer-reviewed journals, and Ms. Bracamontes has analyzed over 2,500 different mixture items using TrueAllele. *Id.*

Ms. Bracamontes used TrueAllele to analyze electronic data provided to Cybergenetics from the swabs of the blade of the knife, swabs from the folding knife, along with reference samples from dried blood of the Victim and the buccal sample from Appellant. *Id.* at 491-92. The results from the knife blade indicated that a match between Appellant and the sample was 60.5 billion times more probable than a coincidental match with an unknown African American person, 16.3 billion times more probable than a coincidental match with an unknown Caucasian person, and 23 billion times more probable than a coincidental match with an unrelated Hispanic person. *Id.* at 497-98. The system indicated that the Victim was an exclusionary match as to the knife blade. *Id.* at 498.

Ms. Bracamontes testified that analysis of the data from the blade of the folding knife indicated a match with the Victim as 2.78 thousand times more probable than coincidence as to an unrelated Caucasian person. *Id.* at 498, 501. Likewise, the data analysis revealed that it was 18.8 thousand more times probable that the Victim was a match than a coincidental match with an unrelated African American individual, and 3.27 thousand times more probable a match than a coincidental match with an unrelated Hispanic person. *Id.* at 501.

Ms. Bracamontes further testified that while the PSP testing had a certain threshold for DNA material below which they would not test due to insufficient data, TrueAllele is able to go down to the baseline and that there is no threshold or cut off point. *Id.* at 502. Ms. Bracamontes clarified that TrueAllele "has been validated all the way down to the baseline and is able to use that information in its modeling to separate out those contributors." *Id.*

On cross-examination, Ms. Bracamontes explained that TrueAllele is considered a probabilistic genotyping software because "it is not just pulling things out definitely[,]" instead "[i]t is assigning them some probability or chance of explaining the data." *Id.* at 504. Ms. Bracamontes reiterated that Cybergenetics does not analyze the actual samples, but interprets data produced by another laboratory from an evidence sample. *Id.* at 505.

Detective Ivan Martinez ("Detective Martinez"), a twelve-year veteran detective of the Berks County District Attorney's Office, testified that on July 20, 2020, he, along with Detective

19

Brett Forry, conducted an interview with Appellant at the Berks County Jail System ("BCJS"). *Id.* at 517-18. Because both Detective Martinez and Appellant speak English and Spanish, during the interview, Detective Martinez would translate those portions that were conducted in Spanish into English for his partner. *Id.* at 518-19. The Commonwealth admitted into evidence, and then published to the jury, a video and audio recording of the interview. *Id.* at 519-20; Comm.'s Ex. 293. In the interview, Appellant stated that he had traveled to the Residence from Paterson, New Jersey and that he had been searching for yard sales, and indicated that another, unidentified black male going by "Bu" was at the Residence and holding a yard sale.

Late on July 17, 2020, Detective Martinez arrived at the Residence and proceeded to the area where the Victim's body was located and assisted in securing and removing the body. *Id.* at 521-22. Detective Martinez further observed Sergeant Schade collect fingerprints from the Victim's body. *Id.* at 522.

On July 18, 2020, at approximately 1:30 a.m., Detective Martinez met with Appellant at Central Processing. *Id.* at 522-23. At that time, Appellant was wearing a black tank or muscle shirt, a pair of pink shorts, and a pair of green flip flops. *Id.* at 523. Detective Martinez noted that the shorts that Appellant was wearing were dirty and ripped. *Id.* During his conversation with Appellant, Appellant asked Detective Martinez to call his mother, Belkis Rodriguez, and Detective Martinez did so. *Id.* at 524.

On July 18, 2020, Detective Martinez applied for and was approved for a search warrant for the Residence. *Id.* at 525. During the execution of the search warrant, Detective Martinez's observations were consistent with those of Sergeant Schade and Detective Rentschler. *Id.* at 525-26. Detective Martinez also attended the autopsy of the Victim at Reading Hospital and observed the collection of blood and fingernail clippings from the Victim. *Id.* at 526. Detective Martinez met with Appellant again on July 21, 2020, at the BCJS and, pursuant to a search warrant, collected a buccal swab from Appellant. *Id.* at 528-29.

On July 24, 2020, Detective Martinez placed another five-to-ten-minute telephone call with Appellant's mother. *Id.* at 530. On July 29, 2020, Detective Martinez prepared a criminal complaint and later served the complaint on Appellant at BCJS, whereupon Detective Martinez described Appellant showing "[h]ardly any emotions[,]" and indicating that Detective Martinez needed to deal with information Appellant provided regarding a Mexican cartel "[a]nd that

20

relationship [Appellant] had with the Mexico cartel was more important than," the charges against Appellant, including murder. *Id.* at 531-32.

On July 31, 2020, Appellant placed a phone call to his mother and sister, Leticia Perez[16], which Detective Martinez listened to later, and then translated from Spanish into English. *Id.* at 533-34, 536; Comm.'s Ex. 295. Detective Martinez reviewed translations that were previously prepared by court-certified interpreters, but testified that, according to him, the other translations were not completely accurate, because of differing Spanish dialects. *Id.* at 534-35. Specifically, Detective Martinez testified that he had spent time in Texas and was familiar with the Mexican dialect of Spanish and with certain idiosyncrasies of the dialect. *Id.* at 535. A video and audio presentation of the telephone conversation between Appellant and his mother and sister that was prepared by Detective Martinez, and included his interpretation of the conversation into English, was published to the jury. *Id.* at 538-39; Comm.'s Ex. 297. Detective Martinez's translation of the conversation included Appellant's admission that he was involved in the killing of the Victim and stated that he did it due to his involvement with a Mexican cartel and telling his mother and sister that if he did not kill the Victim, that the cartel would have killed Appellant. Comm.'s Ex. 295.

On August 5, 2020, Detective Martinez met with Officer Yeasted and received all of the evidence collected and Sergeant Schade then took possession of the evidence. *Id.* at 539-40. On August 12, 2020, Detective Martinez entered the evidence collected from Appellant at BCJS and entered the evidence into property. *Id.* at 540.

Detective Martinez testified that on August 17, 2020, based on the invoice for a cell phone found in the Honda, attempted to acquire information regarding an LG Aristo 4 cell phone with the number 551-280-4729 ("the Cell Phone Number"). *Id.* at 540-41. Detective Martinez attempted to call the store in Paterson, New Jersey, where the invoice noted that the cell phone had been purchased, but it was not fruitful. *Id.* at 541-42.

On October 7, 2020, Detective Martinez then traveled to Paterson, New Jersey with detectives from the City of Paterson Police Department to the Metro PCS store. *Id.* at 542. The Paterson detectives were then able to retrieve information from the store employees regarding the

---

[16] Detective Martinez testified that he had several conversations with Appellant's mother, Belkis Rodriguez, and Appellant's sister, Leticia Perez, and was able to recognize the voices of both individuals. *Id.* at 533.

21

Cell Phone Number while Detective Martinez observed from a vantage point viewing the computer screen and the subsequent printing of the information, which was provided to Detective Martinez. *Id.* at 542-43. The Commonwealth then entered a reprinted receipt and payment invoice from Metro PCS indicating that the LG Aristo cell phone with the Cell Phone Number was purchased by a customer named Raphael Perez from the Metro PCS store in Paterson, New Jersey on July 15, 2020. *Id.* at 543-45; Comm.'s Ex. 298. Detective Martinez then identified the LG Aristo cell phone that was recovered from the Honda. *Id.* at 545.

In January of 2021, Detective Martinez requested and was granted a search warrant for Facebook account records for both Appellant and the Victim. *Id.* at 545-46. While Detective Martinez was unable to find any relevant information regarding Appellant's Facebook account and was not able to find any communication between Appellant and the Victim, Detective Martinez was able to verify that the last post from the Victim was on July 16, 2020 at 8:37 a.m. *Id.* at 547.

On July 16, 2021, Detective Martinez applied for and was granted a search warrant for the LG Aristo cell phone recovered from the Honda. *Id.* at 547. Upon executing the search, Detective Martinez was able to confirm that the number from the cell phone matched the Cell Phone Number also included on the Metro PCS receipt and invoice. *Id.* at 548. On June 28, 2021, pursuant to a court order, Detective Martinez requested cell phone records from T-Mobile regarding the Cell Phone Number from July 15, 2020, through July 17, 2020. *Id.* at 549. Specifically, Detective Martinez requested a CDR mediation report and a data report[17], which would provide the locations that the cell phone traveled through during the relevant time period. *Id.* at 549-50.

Detective Martinez described using a computer program called CellHawk, which analyzes data uploaded from the data report to provide the travel location of a specific device. *Id.* at 557. Detective Martinez testified that the information derived through CellHawk indicated that Appellant's cell phone first appeared on the Bern Township cell tower location in the Greenfields area, at approximately 8:39 a.m. and remained in the area into the afternoon. *Id.* at 562-63.

The Commonwealth then introduced a document from the PSP indicating that on the date Appellant was initially stopped in the Honda, he did not possess a valid license to carry a firearm

---

[17] Detective Martinez described a call detail report (CDR) mediation as providing any and all phone calls, text messages that are executed with a specific device, and a data report as providing which cell towers have been communicating with the device itself. *Id.* at 550.

in the Commonwealth. *Id.* at 563; Comm.'s Ex. 303. Detective Martinez confirmed that he was familiar with these forms and that it comported with the PSP licensing status forms that he had received in previous investigations. *Id.* at 563-64.

On cross-examination, Detective Martinez admitted that during interviews with Appellant shortly after his apprehension, Detective Martinez did not believe the story that Appellant was relaying that another person was at the Residence and sold him the items that were later found in the Honda with Appellant. *Id.* at 567-68. Detective Martinez clarified that Appellant purchased the LG cell phone in Paterson on July 15, 2020, at 4:55 p.m. and appeared to remain in that area until approximately 11:57 p.m. *id.* at 576. Appellant's cell phone then traveled into Pennsylvania via Intestate 78 and down Route 222, arriving in Reading around 2:42 a.m. on July 16, 2020, *Id.* at 577. Appellant's cell phone appeared in the area of the Residence around 8:37 a.m. and stayed until approximately 3:07 p.m. *Id.*

Defense first called Sonia Schlamowitz who, at the time, was employed as the chief court interpreter with the Court of Common Pleas of Berks County. *Id.* at 587-88. Ms. Schlamowitz testified that she completed a translation transcription, from Spanish into English, along with Mr. Urdaneta from the interpreter's office, of the telephone call that Appellant placed from BCJS. *Id.* at 590-91. Ms. Schlamowitz further explained that in her process, she first translates the phone call in written format, and then she goes through the phone call again and interprets including nuance into the interpretation. *Id.* at 591. Defense then entered Ms. Schlamowitz's interpreted document into evidence. *Id.* at 592-93; Def. Ex. 5 & 6. On cross-examination, Ms. Schlamowitz clarified that an initial translation was done by Mr. Urdaneta, and that the District Attorney's Office requested that she revise the translation. *Id.* at 593-96.

The Defense next called Arthur Young, a forensic biology specialist with Guardian Forensic Sciences, who was qualified as an expert in the field of forensic DNA analysis. *Id.* at 600-12. Mr. Young prepared a report based on documentation and data received regarding the evidence analysis. *Id.* at 613-14. Mr. Young first discussed his analysis of the swab from the basement sliding door using electrophoresis, which produces an electropherogram that Mr. Young then interprets. *Id.* at 615-16. Mr. Young noted that the PSP DNA laboratory determined that there was insufficient DNA material from which to produce interpretable results. *Id.* at 614. However, Mr. Young continued that he reviewed the data provided by the PSP lab and found conflicting results

23

as to the sliding door swabs. *Id.* at 627. Specifically, according to Mr. Young, the DNA data actually excluded both Appellant and the Victim as contributing the DNA found in the swab of the basement sliding door and was indicative of DNA from an unknown male. *Id.* at 627-28. Mr. Young explained that the PSP lab needed five genetic markers in order to draw a conclusion, but he only needed one genetic marker for purposes of elimination. *Id.* at 628-29.

Mr. Young then reiterated the PSP lab results regarding the sample from the Adidas sneaker wherein both Appellant and the Victim could not be excluded as against an unknown and unrelated individual against each. *Id.* at 631. However, Mr. Young opined that if both individuals were to be included in determining the results, then there should be no remaining DNA material that was inconsistent with both individuals, but that was not the case. *Id.* at 632. Using charts from his report, Mr. Young explained that there were genetic markers that were not consistent with either Appellant or the Victim should indicate genetic material from another individual, and specifically from an unknown male. *Id.* at 634-38. Moreover, as Mr. Young elucidated, modern DNA analysis is sensitive enough o detect genetic material even through transference and so the tests cannot determine how the DNA material got onto whatever item is tested. *Id.* at 637-38.

Mr. Young then discussed the PSP results from the inside tongue and heel of the Adidas sneaker and those results indicated a mixture of genetic material from four individual contributors, with Appellant and the Victim not excluded as contributors. *Id.* at 638. However, upon reviewing the data from all of the genetic markers, Mr. Young opined that the Victim should be excluded as a contributor to the mixture found on the inside heel and tongue of the Adidas sneaker because there were markers listed from the Victim's sample that were not found in the swabs from those areas. *Id.* at 643-48.

Mr. Young moved on to the results from the swabs of the handle of the second knife, which the PSP lab found a mixture of DNA from two individuals and concluded that Appellant could not be excluded as a contributor and the Victim could not be included as a contributor. *Id.* at 652-53. Mr. Young testified that his interpretation of the data reached a different result. *Id.* at 655-56. Notably, Mr. Young indicated that there was a genetic marker include din the swab that was consistent with that of the Victim such that he would not conclude that the Victim would be excluded as a possible contributor to the DNA profile, or at best, that the results are inconclusive. *Id.* at 656-58.

24

As to the sample from the blue Versace shirt, Mr. Young noted that the PSP found a mixture of DNA material from two individuals and concluded that both Appellant and the Victim could not be excluded as possible contributors to the profile. *Id.* at 657-58. Again, though, Mr. Young disagreed with the conclusion because the individuals were compared as against another unknown individual and not as the two sole contributors, which, according to Mr. Young, would have produced results inconsistent with a mixture only from Appellant and the Victim. *Id.* at 659. Thus, Mr. Young posits that the conclusion, when the profiles are analyzed as only Appellant and the Victim as contributors, would result in being mutually exclusive. *Id.* at 659. Mr. Young continued that when comparing more genetic material markers, the alleles that are shared between both Appellant and the Victim were attributed to both, even where Appellant could be excluded as to additional alleles that should appear. *Id.* at 661-62. Thus, the statistical weight is affected in adding the shared alleles to the analysis. *Id.* at 662.

On cross-examination, Mr. Young agreed with Ms. Richart's conclusion that Appellant could not be excluded as a contributor to the genetic material found on the black and orange mask. *Id.* at 683. Mr. Young further noted that while he disagreed with Ms. Richart's conclusion that Appellant could not be excluded as a contributor to the DNA profile of the swabs found on the heel and left side of the Adidas sneaker, he did agree that the Victim was not excluded. *Id.* Moreover, as to the inside tongue and heel swabs, Mr. Young agreed that Appellant was not excluded as a potential contributor but disagreed that the Victim should be included. *Id.* at 684. Likewise, Mr. Young agreed that neither Appellant nor the Victim could be excluded as contributors to the DNA profile from the sample from the shorts. *Id.* at 685-66. Finally, while Mr. Young opined that Appellant should be excluded as a contributor to the profile mixture found on the blue Versace shirt, he agreed that the Victim would not be excluded. *Id.* at 686.

At the conclusion of the trial on April 21, 2022, the jury found Appellant guilty of Murder of the First Degree[18], Burglary[19], Robbery[20], Aggravated Assault[21], two counts of Receiving Stolen Property[22], and two counts of Firearms Not to be Carried Without a License[23].

---

[18] 18 Pa.C.S.A. § 2502(a)
[19] 18 Pa.C.S.A. § 3502(a)(1)(i)
[20] 18 Pa.C.S.A. § 3701(a)(1)(i)
[21] 18 Pa.C.S.A § 2702(a)(1)
[22] 18 Pa.C.S.A. § 3925(a) (Honda CR-V); 18 Pa.C.S.A. § 3925(a) (Lenovo Laptop Computer)
[23] 18 Pa.C.S.A. § 6106(a)

On May 2, 2022, Appellant filed a post-sentence motion challenging the weight and sufficiency of the evidence and alleging error of the court in permitting electronically obtained documents from T-Mobile and limiting the scope of the Defense expert's testimony at trial. On March 21, 2022, A hearing on the motion was held on July 29, 2022, and both parties filed briefs in support of their respective positions. By order dated August 25, 2022, the court denied Appellant's post sentence motion.

On September 23, 2022, Appellant filed a Notice of Appeal with the Superior Court. On September 27, 2022, entered an order directing Appellant to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). Appellant filed a Concise Statement of Matters Complained of on Appeal on October 18, 2022, in which he sought review on the following issues:

1. The evidence adduced at trial was legally insufficient to support Appellant's convictions for Homicide, Aggravated Assault and Robbery, where, *inter alia*, there was no testimony or circumstantial proof at all

   - that [Appellant] and the [V]ictim were ever in the latter's house at the same time, so as to make any of those crimes possible;

   - that Appellant ever touched or threatened [the Victim] personally, or was ever in a position to do so;

   - that some burglar or assailant or acquaintance other than Appellant was not the perpetrator of these gravamens in or near the [V]ictim's house, even if Appellant might have been present therein or stolen something therefrom at some other time, before or after the [V]ictim's murder.

   Nothing in the record excludes the possibility of an alternative perpetrator; inexplicably, the police did not attempt to investigate the possibility of another perpetrator, even in the face of abundant evidence that there was at least one: and cases almost factually identical or at least corresponding to this one in all essential points will show that under such nebulous circumstances these convictions of Appellant cannot stand.

2. The evidence was legally insufficient to support Appellant's conviction of Receiving Stolen Property, when no facts on record established the value of the items stolen, and it could not be confidently inferred what the value of the stolen

items were or what burglar was responsible for which theft. The conviction therefore had to have been impermissibly based on idle speculation.

3. All Appellant's convictions were based on evidence derived from an illegal search of the [V]ictim's house, in which the Commonwealth did not show or even attempt to show that Appellant had no expectation of privacy. Once challenged, the Commonwealth has an affirmative duty to justify an otherwise illegal search by showing that the defendant has no expectation of privacy, instead the court gratuitously assumed this burden *sua sponte* in it's decision on Appellant's pretrial suppression-motion.

4. All guilty verdicts went against the weight of the evidence, much for the same reasons as those mentioned above with regard to evidentiary sufficiency, but also, *inter alia*, because of the inexplicable lack of police investigation into other possible culprits; because Appellant's supposedly self-inculpatory phone-call from prison was so obviously *exculpatory* in nature, though it was perversely accorded inculpatory weight, even though he implicated some unnamed others; and because in general all testimony purporting to incriminate Appellant was so weak and wispy that to dismiss any reasonable doubts as to his innocence after three or four days of trial but only ninety minutes of supposed deliberation – a homicide trial – is preposterous.

5. At the very least, a new trial is warranted, because by upholding the Commonwealth's objection and not allowing [Appellant's] Expert Witness to answer questions regarding the testimony of the Commonwealth's expert from Cybergenetics the lower court critically impaired Appellant's ability and right to defend himself. This was an abuse of discretion and contrary to elementary rules of evidence.

6. Also warranting a new trial is the lower court's improvident admission of unauthenticated hearsay evidence from Detective Martinez, namely documents obtained electronically from T-Mobile that led to the admission of other evidence that prejudiced Appellant. Detective Martinez received the documents electronically, did not see the author sign them, otherwise had no

27

personal knowledge regarding the sender, and had he any personal knowledge of the business practices of T-Mobile Telekom.

Appellant's Concise Stmnt. ¶¶ 1-6.

Upon review of the record, we find that all alleged errors lack merit. We submit this opinion pursuant to Pa.R.A.P. 1925(a).

## DISCUSSION

### I.   *Sufficiency of the Evidence*

Appellant contends that the evidence presented by the Commonwealth was insufficient to establish his conviction on the charges of homicide, aggravated assault, and robbery at trial. Specifically, Appellant claims that the Commonwealth failed to present sufficient evidence that Appellant was ever at the Residence at the same time as the Victim to present such an opportunity to commit the crimes, or that he was ever in a position to threaten or touch the Victim personally. Appellant further claims that no evidence or testimony eliminated the possibility of another perpetrator having committed the crimes and that law enforcement only investigated Appellant to the exclusion of other possible suspects.

Appellant likewise challenges the sufficiency of the evidence to support the convictions of receiving stolen property. Appellant claims that the evidence was insufficient to establish the value of the items stolen evidence or who stole them.

In reviewing a claim that the evidence was insufficient to support the verdict, our Superior Court has stated that:

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Miklos*, 159 A.3d 962, 967 (Pa.Super. 2017). Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa.Super. 2014).

28

"Moreover, if a fact finder reasonably determines from the evidence that all of the necessary elements of the crime were established, then the evidence will be deemed sufficient to support the verdict." *Commonwealth v. Heidler*, 741 A.2d 213, 215 (Pa.Super. 1999); *see also Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011)(noting that "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence").

## Homicide

In order to convict a person of first degree murder, "the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill." *Commonwealth v. Johnson*, 107 A.3d 52, 66 (Pa. 2014) *cert. denied sub nom. Johnson v. Pennsylvania*, 577 U.S. 831, 136 S.Ct. 43, 193 L.Ed.2d 52 (2015)(citation omitted). "It is well-settled that specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon on a vital part of the victim's body." *Id.* "Malice, as well, may be inferred from the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Houser*, 18 A.3d 1128, 1134 (Pa. 2011). Moreover, "proof of motive is not necessary for a conviction of first-degree murder." *Commonwealth v. Chmiel*, 889 A.2d 501, 517 (Pa. 2005).

When initially stopped, Appellant was found in possession of multiple items belonging to the Victim, including the Victim's Tesla car fob, graduation rings, laptop, wallet, identification cards, and various credit and debit cards. After finding these items, law enforcement proceeded to the Residence, and when unable to make initial contact, made various attempts to reach the Victim. Upon entering the Residence, officers found the rooms, drawers, and closets disheveled as if they had been ransacked. Alarm panels were found ripped off of the wall and on the floor. When they returned with a search warrant for the Residence, they discovered the Victim deceased in the rear of the Residence.

Dr. Hoffman concluded that the Victim died from exsanguination and internal bleeding caused by multiple stab wounds to the Victim's neck and chest. Dr. Hoffman testified that the nature and varying direction of the injuries indicated that the bodies were in close contact and in motion, signaling a struggle occurred during the infliction of the wounds. Further, while Dr. Hoffman suggested that the maggot activity he observed were indicative that the Victim's time of death was approximately thirty to forty-hours prior to discovery, he noted that information

provided by law enforcement allowed him to narrow that period to between 8:45 a.m. and 12:00 p.m. on July 16, 2020.

During his interview with detectives, Appellant admitted that he had been to and was able to describe the Residence in detail. In a phone call with his sister and mother, Appellant admitted being involved in the murder of the Victim but claimed that the Victim would purchase drugs from him and was involved in human trafficking and that the Victim's murder was directed by a Mexican cartel.

Cell phone records tracked Appellant's movements from Paterson, New Jersey and arriving in the area of the Residence around the time of the Victim's murder and remaining until the afternoon. Several people observed an individual matching Appellant's description and clothing at or around the Residence, including several who retuned the Victim's wandering dog and found the individual's response as odd or apathetic. Jeffery Neubauer identified Appellant as the individual he saw at the Residence when presented a photographic array and he told law enforcement officers that he noticed the individual at the Residence wearing the same branded underwear as was later recovered from Appellant.

While no evidence was found regarding the actual murder weapon, there was genetic evidence linked to the Victim found on Appellant's shoes that were found at the Residence. Additionally, the Victim's DNA was found on Appellant's shirt.

Viewing the evidence presented at trial in totality, the Commonwealth presented sufficient evidence to place Appellant at the Residence a the time of the Victim's murder, including cell phone records and eye witnesses who either identified Appellant, or described an individual matching Appellant's description as being present at the Residence on the date of the Victim's death, and even posing as the Victim himself. Blood and DNA evidence was found on Appellant's shoes and clothing. Appellant confessed being at the Residence to law enforcement and admitted to his sister and mother of, at least, being involved in the Victim's murder. Again, Dr. Hoffman's testimony concluded that the Victim died as a result of the stab wounds and noted that the direction and severity of the wounds indicated a struggle. Moreover, the location of the stab wounds to the neck and chest evinces both malice and an intent to kill. Given the reasonable inferences that could be drawn from the evidence presented, we find that Appellant's challenge to the sufficiency of the evidence to support his conviction for murder of the first-degree lacks merit.

30

## Aggravated Assault

Under the Crimes Code, "[a] person is guilty of aggravated assault if he . . . (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). "Serious bodily injury," is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. "[W]here the victim suffers serious bodily injury, the Commonwealth need not prove specific intent[,]" but "need only prove appellant acted recklessly under circumstances manifesting an extreme indifference to the value of human life." *Commonwealth v. Nichols*, 692 A.2d 181, 185 (Pa.Super. 1997). The degree of recklessness required under the aggravated assault is "such that life threatening injury is essentially certain to occur." *Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995).

Based on the evidence set forth above in support of Appellant's conviction for murder, we find the same supports Appellant's conviction for aggravated assault. The evidence places Appellant at the Residence at the time of the Victim's murder. Dr. Hoffman testified as to the multiple stab wounds to the Victim's neck and chest – vital areas of the body – demonstrating, at the very least, Appellant's reckless behavior to the degree that life-threatening injury was almost certain to result. Appellant's challenge to the sufficiency of the evidence for the conviction of aggravated assault

## Robbery

Under the Pennsylvania Crimes Code, "[a] person is guilty of robbery if, in the course of committing a theft, he . . . (i) inflicts serious bodily injury upon another." 18 Pa.C.S.A. § 3701(a)(1)(i). Furthermore, "[a]n act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S.A. § 3701(a)(2). As stated above, "serious bodily injury," is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

The testimony and evidence presented by the Commonwealth at trial demonstrated that Appellant was in the area at the time of the Victim's murder and was later found with various valuables and belongings of the Victim in the stolen vehicle he was driving. Included in those

31

items were the Victim's two graduation rings, his laptop, debit and credit cards, coins, and a camera. As previously discussed, Dr. Hoffman testified as to the nature, extent, degree, and direction of the Victim's stab wounds that were indicative of a struggle and that the wounds were to the Victim's chest and neck area, which were vital areas of the body. It is clear that the perpetrator caused serious bodily injury to the Victim, who died as a result of his injuries.

Appellant contends, *inter alia*, that there was no evidence that Appellant and the Victim were both in the Residence at the time the offenses were committed and that there is nothing connecting Appellant to any contact with the Victim. However, the cell phone records place Appellant in the area of the Residence at the time of the Victim's murder. Several eyewitnesses described Appellant, or at least an individual strongly resembling Appellant at the Residence during the time that the offenses were committed. Law enforcement noted that the condition of the Residence as being ransacked, including that the alarm panels were ripped from the walls. Cell phone records further track Appellant as leaving the area in the afternoon, subsequent to the Victim's murder.

Based on the evidence presented at trial, we find the evidence sufficient for the jury to infer that Appellant, during the course of committing a theft, murdered the Victim by causing life-threatening injuries to vital areas of the body. Appellant's challenge, therefore, must fail.

## Receiving Stolen Property

"In order to convict a defendant of Receiving Stolen Property [("RSP")], the Commonwealth must establish three elements: "(1) intentionally acquiring possession of the movable property of another; (2) with knowledge or belief that it was probably stolen; and (3) the intent to deprive permanently." *Commonwealth v. Gomez*, 224 A.3d 1095, 1099 (Pa.Super. 2019); 18 Pa.C.S.A. § 3925(a).

Based on this court's review of the Concise Statement, Appellant's challenge as to his conviction for RSP is only as to count seven for the items stolen from the Victim's Residence. Appellant claims that no evidence on the record established the value of the items stolen or who stole which items. Appellant notes that because of this, the jury could only have reached its verdict and assigned a value on pure speculation. We disagree.

At trial, the Commonwealth, through the Victim's son, introduced insurance documents indicating the valuation of some of the items at the Residence. Included in that documentation

32

was a valuation of the Victim's U.S. Air Force Academy graduation ring, which was assigned a value of $2,795. Trial N.T. at 110; Comm.'s Ex. 3. While the jury could infer at least some value to other items stolen, including the Victim's other jewelry, the credit and debit cards, and the laptop, the valuation of the Air Force Academy ring alone was sufficient to support the jury's separate finding that the value of the stolen items received and retained by Appellant exceeded $2,000.

To the extent that Appellant contends that no evidence was demonstrative as to "what burglar was responsible for which theft." We find this claim is likewise unconvincing. The Commonwealth placed Appellant at the Residence through cell phone records and eyewitness identification. Appellant admitted being at the Residence. Appellant's explanation that he obtained the items from an alleged yard sale purported to be held by some other unidentified individual is not supported by the evidence. No other witness saw any yard sales occurring at the Residence or elsewhere in the neighborhood. Appellant was found in a stolen vehicle with items belonging to the Victim and with a flimsy excuse for his possession of the items. The jury could obviously infer from Appellant's possession of the items that he was aware that the items were stolen, and that, in fact, he stole the items. However, evening assuming *arguendo* that Appellant was not the person who stole the items, his conviction for RSP would not be affected as his possession of the stolen items, and his knowledge, which could be inferred, was sufficient to sustain the conviction. As such, we find that the alleged errors challenging the sufficiency of the evidence are without merit.

## II. *Pretrial Denial of Suppression of Evidence*

Appellant next contends that the court erred in denying his pretrial motion for suppression of evidence derived from the search of the Residence. Specifically, Appellant claims that this court assumed the burden of the Commonwealth in addressing the issue of Appellant's expectation of privacy in its opinion in disposition of the pretrial motions. Such an assertion is clearly meritless.

> Challenges to a defendant's expectation of privacy involve shifting burdens of proof. The Commonwealth initially bears the burden of producing evidence that shows the defendant lacked a reasonable expectation of privacy in the area searched. If the Commonwealth produces evidence placing the defendant's lack of a reasonable expectation of privacy at issue, then the burden shifts to the defendant to persuade the suppression court that he has a reasonable

33

expectation of privacy in the area searched. Where the Commonwealth produces evidence placing the defendant's reasonable expectation of privacy at issue, and the burden of persuasion has shifted, the defendant may, but is not required to, produce his own evidence to meet his burden to persuade the court that he had a reasonable privacy interest in the area searched. Thereafter, it is incumbent on the suppression court to consider all of the evidence to determine whether the Commonwealth met its burden of production, and, if so, whether the defendant met his burden of persuasion that he possessed a reasonable expectation of privacy in the car.

*Commonwealth v. Jackson*, 284 A.3d 907 (Pa.Super. 2022)(internal citations and quotation marks omitted). *See also Commonwealth v. Skipper*, 277 A.3d 617, 621 (Pa.Super. 2022)(noting that "Our Supreme Court has explained that, while the expectation of privacy can be described as a 'preliminary' matter, Pa.R.Crim.P. 581(H) nevertheless requires the Commonwealth to both challenge a defendant's expectation of privacy **and** demonstrate that the defendant lacked an expectation of privacy"(emphasis in original)). Similarly, our Supreme Court has provided:

> [T]he defendant's ability to meet this burden is not a prerequisite to the Commonwealth's initial burden of production, a burden it must satisfy in all cases. *See* Pa.R.Crim.P. 581 cmt. Rule 581(H) clearly states it is the Commonwealth's burden to present evidence that the defendant's constitutional rights were not infringed. The Commonwealth may concede the privacy interest, choosing to contest only the legality of police conduct; if it does so, the defendant's "reasonable expectation of privacy" need not be established. However, if the evidence of the Commonwealth, the party with the burden of production, shows the defendant lacked such a privacy interest, the burden of establishing the contrary is on the defendant.

*Commonwealth v. Enimpah*, 106 A.3d 695, 701 (Pa. 2014). Nevertheless, "[t]o be sure, under our jurisprudence, the defendant bears the burden of persuasion with respect to his privacy interest[,]" and "if the evidence shows there was no privacy interest, the Commonwealth need prove no more; in terms of the court's review, it need go no further if it finds the defendant has not proven a reasonable expectation of privacy." *Id.* at 701-02.

We begin by noting that the Commonwealth, in its response to Appellant's pretrial motion, raised the issue of his expectation of privacy, and again in its post-hearing brief in support of denial. The Commonwealth asserted that the testimony at both the preliminary hearing, and that presented during the pretrial suppression hearing, demonstrated that Appellant had no conceivable privacy interest in the Victim's Residence.

34

As the court set forth in its opinion in disposition of Appellant's omnibus pretrial motions dated March 29, 2021, the testimony at the pretrial hearing established that Appellant was initially pulled over in the stolen Honda with items belonging to the Victim in the Honda with him. Appellant was not present at the Residence when law enforcement entered the property. After being arrested, Appellant initially denied that he had knowledge of the Residence, but later acceded that he had been to the Residence for a yard sale and was admitted by a black male identified as "Bu" who sold the items found in Honda with Appellant. Appellant was not found to be in possession of a key to the Residence and there is no indication that Appellant had the subjective expectation of privacy or the ability to exclude others from the Residence.

We stand by the court's March 29, 2021, opinion and the conclusion set forth therein. We disagree with Appellant that the court usurped the burden of establishing that he lacked sufficient expectation of privacy. It is evident from the notes of testimony of the pretrial suppression hearing that the Commonwealth satisfied its burden in presenting testimony that Appellant lacked a reasonable expectation of privacy in the Residence. Therefore, we find that Appellant's allegation of error lacks merit.

## III.  *Weight of the Evidence*

Appellant next claims that the verdict was against the weight of the evidence. While Appellant cites to the reasons set forth in his challenge to the sufficiency, he also notes that law enforcement failed to investigate any other possible perpetrators. Appellant continues that his statements during the phone call to his mother and sister were obviously exculpatory, but were perverted to appear inculpatory, even though he implicated other unnamed parties in the Victim's murder. Finally, Appellant claims that the relatively short deliberation period of the jury to reach its verdicts based on the "weak and wispy" evidence was "preposterous."

Where the weight of the evidence has been challenged, "[a] new trial should be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice.[24]" *Davis v. Mullen*, 773 A.2d 764, 766 (Pa. 2001).

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 751–52 (Pa. 2000)(internal citations and quotation marks omitted). Likewise, "a trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is one of the least assailable reasons for granting or denying a new trial." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa.Super. 2003). An appellate court's role "is to review the trial court's exercise of discretion in ruling on a weight of the evidence challenge," and "not [to] review the underlying question of whether the verdict is against the weight of the evidence." *Id.*at 807.

The verdict of the jury will not be disturbed "unless the weight of the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Juray*, 275 A.3d 1037 (Pa.Super. 2022). "The jury is the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses," and "[a] jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit." *Commonwealth v. Clemons*, 200 A.3d 441, 464 (Pa. 2019). "Issues of witness credibility include questions of inconsistent testimony and improper motive." *Commonwealth v. Sanchez*, 36

---

[24] Our courts have stated that a verdict shocks the conscience, "[w]hen "the figure of Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa.Super. 2004), *aff'd,* 938 A.2d 198 (Pa. 2007).

36

A.3d 24, 39 (Pa. 2011). Moreover, "[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Lewis*, 911 A.2d 558, 565 (Pa.Super. 2006).

At trial, the jury heard all of the testimony and was presented the evidence. The Commonwealth presented evidence that Appellant was stopped in a stolen vehicle with a substantial amount of the Victim's valuables and belongings both on his person and in the vehicle. The jury heard evidence tracking Appellant's location from Paterson, New Jersey, where the vehicle had been stolen, and to the area of the Residence. When law enforcement arrived at and later searched the Residence, they found the home ransacked and the alarm panels ripped from the walls. The Victim's Tesla vehicle, to which Appellant had the fob on his person, was still in the garage. Dr. Hoffman testified that the Victim's time of death was between 8:45 a.m. and noon on July 16, 2020, which was around the same time that Appellant arrived and remained in the area of the Residence. Several eyewitnesses place Appellant, or at least an individual resembling Appellant at the Residence on July 16, 2020, and even identifying himself as the Victim. Dr. Hoffman further testified as to the extent of the Victim's injuries and the conclusions drawn from both bruising and abrasions observed on the Victim, and from the direction and severity of the stab wounds. The Commonwealth also presented blood and DNA evidence from the Victim found on Appellant's sneaker and shirt. Despite Appellant's contention otherwise, the phone call to his sister and mother, at a minimum, implicated Appellant in the Victim's murder, regardless of his various justifications or suggestion of other unnamed individuals. Based on all of the evidence presented, it is clear that the trial court did not abuse its discretion in denying Appellant's post-sentence challenge to the weight of the evidence.

The jury's verdict indicates that they lent credibility to the Commonwealth's witnesses and did not choose to accept the Defense's witness' dispute of the blood and DNA evidence. The verdicts rendered by the jury were not against the weight of the evidence. Further, Appellant's attack on the deliberation period of the jury as somehow demonstrative of a lack of diligence on the part of the jury is absurd. The jury spent four days observing the testimony and evidence and was properly charged by the court in its analysis of the evidence. We draw no inference from the fact that the jury was able to come to a decision in what Appellant deemed a relatively short amount of time. Therefore, we find Appellant's claim that the court abused its discretion as to the weight of the evidence to be without merit.

37

## IV. Limitation on Appellant's Expert at Trial

Appellant next claims that this court erred when it sustained the Commonwealth's objection to his expert witness. Specifically, Appellant contends that by upholding the Commonwealth's objection, and not allowing his expert to answer questions regarding the Commonwealth's expert from Cybergenetics, the court abused its discretion resulting in prejudice to Appellant. We disagree.

At trial, during direct examination of his expert witness, Defense Counsel began to question Mr. Young regarding data and information contained in the report from Cybergenetics. However, the Commonwealth objected to Mr. Young referring to the Cybergenetics information because he had not included the discussion of such in his report. The court sustained the objection. Defense Counsel noted his objection on the record.

> A trial court has broad discretion to determine whether evidence is admissible and a trial court's ruling on an evidentiary issue will be reversed only if the court abused its discretion. Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

> Moreover, in cases involving the admission of expert testimony:

> Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice.

> Where the evidentiary question involves a discretionary ruling, [an appellate court's] scope of review is plenary, in that the appellate court may review the entire record in making its decision.

*Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013)(internal citations and quotation marks omitted).

As noted, in the instant matter, the court sustained the Commonwealth's objection and limited Mr. Young's testimony as to the information and data from the Cybergenetics report. In doing so, the court stated that ". . . given that neither of these knives [referred to in the Cybergenetics report] have been in any way referred to as the murder weapon or a potential murder weapon in this case, the materiality of it is extremely small. If there is any materiality at all. The objection sustained." Trial N.T. at 675.

38

In discussing a trial court's limitation of testimony by a defense expert witness, our Superior Court has noted:

> Although there are no rules of procedure in criminal cases precisely governing the scope of expert trial testimony, it cannot be asserted that either the Commonwealth or a defendant has *carte blanche* to allow an expert to testify beyond the information contained in his or her report.

*Commonwealth v. Williams*, 241 A.3d 1094, 1106 (Pa.Super. 2020).

In *Commonwealth v. Stith*, 644 A.2d 193 (Pa.Super. 1994), the Superior Court discussed the admissibility of expert testimony that exceeded the scope of disclosed reports. On appeal of his conviction for driving under the influence, Stith challenged the admission of an expert witness' testimony, in part, on the allegation that the witness had testified beyond the scope of this report. *Id.* at 197. While Stith conceded that "there [were] no reported criminal cases which discuss the appropriate remedy where the Commonwealth introduces expert testimony exceeding the scope of an expert report[,]" he instead relied "upon civil rules and case law to support his notion that in criminal cases, an expert is limited to testifying only to the facts contained in his or her report." *Id.* at 197-98. Stith cited to Pa.R.C.P. 4003.5(c), which provides in relevant part: "To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings . . . . the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony." Pa.R.C.P. 4003.5(c). The Court, in affirming Stith's judgment of sentence, concluded that the expert did not testify beyond the scope of his report. *Id.* at 198.

In the unreported case of *Commonwealth v. Reeves*,[25] 1566 WDA 2017, 2019 WL 3383703, at *1 (Pa.Super. July 25, 2019), the Court cited to the *Stith* Court's decision and noted the reliance on the civil rules in determining whether an expert's testimony exceeded the fair scope of his report. Again, the Court found that the expert's report did not exceed the fair scope as there would be a "'fair extension' of his reports, [which] would be to explain the very findings, interpretations and diagnosis with which he agreed." *Id.* at *10.

---

[25] "Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value, pursuant to Pa.R.A.P. 126(b)." 210 Pa.Code § 65.37.

Pa.R.A.P. 126(b) provides that "unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019 . . . may be cited for their persuasive value."

It is clear from the above decisions that an expert's testimony at a criminal matter is subject to the same "fair scope" of his disclosed report as is consistent with the Civil Rules. Dr. Young's report did not discuss the Cybergenetics results or report. Therefore, the trial court did not abuse its discretion in precluding Dr. Young from testifying about the Cybergenetics report as it would exceed the fair scope of his disclosed report.

Moreover, as our Superior Court has stated, "[a] discovery violation and testimony exceeding the scope of the expert's report, as a result of court questioning, do not automatically command a new trial. Appellant still must establish that the introduction of the expert testimony caused him prejudice to the degree that it affected his trial strategy or likely affected the outcome of the proceedings." *Commonwealth v. Roles*, 116 A.3d 122, 133 (Pa.Super. 2015). The same must be the case where a trial court has precluded testimony beyond the scope of an expert's report. Instantly, Appellant merely asserts that preventing Dr. Young from testifying regarding the Cybergenetics results was prejudicial and requires a new trial to remedy the error. We disagree.

As the trial court noted, nothing in the Cybergenetics report was germane to the issue and no harm was caused to Appellant in precluding Dr. Young from providing his opinions on results from the two knives that demonstrated they were not the murder weapons. Consequently, Appellant's allegation of error lacks merit.


## V. *Admission of T-Mobile Documents*

Appellant finally contends that the admission through Detective Martinez's testimony of documents from T-Mobile regarding the cell phone activity of Appellant's cell phone, over Defense Counsel's objections, was prejudicial to Appellant. We find Appellant's argument unavailing.

At trial, when the Commonwealth sought to introduce the Metro PCS records for the Cell Phone Number, and in doing so, Detective Martinez read into the record a certification from Lauren Collins of the Law Enforcement Relations Group with T-Mobile MetroPCS indicating that the records were regular business records and were produced in compliance with Federal Rules of Evidence and state equivalents, Defense Counsel objected. During the subsequent sidebar conversation, the following discussion occurred:

40

[ASSISTANT DISTRICT ATTORNEY ("ADA")]: Your Honor, in anticipation of this evidence being introduced on March 30th, 2022, I sent Mr. Bompadre a letter informing him of our intent to introduce these documents. And I specifically mentioned that we had attached the document that Mr.—or excuse me, Detective Martinez is currently reading from in order to comply with Rule of Evidence 803[(6)] and 902[(11)].

THE COURT: Did you receive any response?

ADA: I did not.

DEFENSE COUNSEL[26]: Your Honor, the documents have to still be reliable. These are business records that were produced by a company that they are relying on the data that was sent to them, and there is – he doesn't have the personal knowledge or the witness doesn't have personal knowledge.

THE COURT: The same thing applies to a bill from a contractor, I mean the rules are clear on this stuff. Your objection is overruled.

Trial N.T. at 552-53.

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa.Super. 2020)(citation omitted).

Hearsay is defined as "as an out-of-court statement, which is offered in evidence to prove the truth of the matter asserted." *Commonwealth v. Busanet*, 54 A.3d 35, 68 (Pa. 2012); Pa.R.E. 8-3(c). "Hearsay statements are generally inadmissible unless they fall under an enumerated exception." *Id.*; Pa.R.E. 802. Rule 803 of the Pennsylvania Rules of Evidence provides such exceptions, in relevant part:

> **Rule 803. Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness**
>
> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> \* \* \* \*

---

[26] We note that while the transcript ascribes this statement to ADA Charles Prutzman, Esq., the response was actually made by Defense Counsel, Adam Bompadre, Esq.

(6) Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, *or by a certification that complies with Rule 902(11)* or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6)(emphasis added). Pertinently, Rule 902 of the Rules of Evidence provides that:

> **Certified Domestic Records of a Regularly Conducted Activity.** The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with Pa.R.C.P. No. 76. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Pa.R.E. 902(11).

The Commonwealth's presented a document executed by Lauren Collins of the T-Mobile Law Enforcement Relations Group indicating that the records met the conditions set forth in Pa.R.E. 303(6)(A)-(D). At trial, the ADA noted that he sent notice to Trial Counsel pursuant to Pa.R.E. 902(11) on March 30, 2022. While Appellant argues that Detective Martinez lacked personal knowledge of the records being introduced and admitted, there was no such requirement as required under the Rules of Evidence. The Commonwealth complied with Rule 902(11) and the document conforms to Rule 803(5)(A)-(D). Therefore, there would be no reason for the trial court to prevent admission of the records. Appellant's claim of error thus fails.

## CONCLUSION

For all of the foregoing reasons, we find that all of Appellant's allegations of error lacks merit. Accordingly, we urge the Superior Court to affirm the judgment of sentence.